## KING v. THE STATE OF GEORGIA.

BLANDFORD, J.—The evidence introduced on the part of the State to show the guilt of the plaintiff in error of the crime of murder, is so obscure as to lead to the belief that justice would require another trial of this case.                    *Judgment reversed.*

December 16, 1889.

Criminal law. Murder. Evidence. New trial. Before Judge MILNER. Gordon superior court. February term, 1889.

Amos King was indicted for murder, on Friday, December 6, 1888, of Daniel Printup. The evidence was entirely circumstantial. Printup was found, about three or half past three o'clock in the morning, lying dead near the railroad track and depot in the town of Calhoun, Gordon county, between the main and side track, his head towards the main line. Trains passed frequently during the night; the way-freight came at half past three, but he was not killed by that train. There was no blood on the tracks. He was cold and stiff, except one leg, which seemed to be limp. His skull was fractured. There was a gash, sufficient to have caused

his death, on the right side of his head, about three inches
long, extending to his brain, and looking as if it had
been done with some sharp instrument like an axe.
The witness who so testified also said that the wound
could have been made with a round stick, and that it
looked like it was done with a stick or shovel.  Prin-
tup's leg was broken, according to the testimony of one
witness.  Another testified that a heel was torn off but
it had not bled any, that the wound on the head looked
like it had been cut with something, and that there was
a small puddle of blood where the body was lying.  A
passenger-train passed this place at fourteen minutes
after two o'clock, but there was no indication that it
killed Printup.  The corner of a passenger-coach is
round.  On the night of the killing, Printup, defendant
and others were at a party, and defendant was drinking
and shoving and knocking one Hamp Bosseau, and
Printup told him that Hamp's father had just died and
it looked like defendant wanted to impose on his boy
and run over him; but no further quarrel appears to
have occurred.  With a number of others, Printup left
the party, stopped at the house of one Hester Ann, and
left there alone before twelve o'clock.  On the way to
this house, he and those with him were approached by
defendant, and a little conversation ensued between de-
fendant and one Jennie Bosseau relative to her carrying
some chickens to Rome, where defendant's family
lived.  When defendant left this crowd, he went to-
wards the railroad, and they went down the street.  He
returned to the party about one o'clock, and about fif-
teen minutes afterwards, Bill Harlon (who had gone
out with Printup when he left) came in, and they sat
down.  Bill looked like he was asleep, had his head
down between his hands; they did not take much
further part in the party; did not have much to say.
Defendant also had a little row with a boy named

Willie Harper, and John Harper interfered, and defend-
ant got a little mad and asked John if he wanted to
take it up. Defendant and Jennie Bosseau were sitting
side by side; Will Harper was drunk and going about
cursing, and wanted to get out between defendant and
Jennie, and defendant told him to go off, and pushed
him around; and Printup told John Harper that his
brother and defendant were drunk, and to take him
away and not let him be slapped around; and at last
Jennie caught hold of Will and said, " Come, let's go,"
and they left. Defendant left the party the second
time about half past one or two o'clock. Nancy Lay,
who left with him, testified that he went home with her
and staid there from two until five o'clock; that there
was only one room, with two beds in it, and one door;
that he laid in one bed by himself, and she never missed
him during the night; and that she was sure he was in
the room from two until five o'clock. She staid up
only long enough to fix the bed, got up when the four
o'clock passenger-train went down, and when the five
o'clock train passed she left the house, leaving defend-
ant there in bed. Printup does not appear to have been
seen again after he left Hester Ann's until his body was
found. His clothing was not much disturbed and looked
much like it looked previously in the night. Bill Har-
lon testified that he did not go back to the party at all;
that he did not know who killed Printup; that he left
the party with Printup and others, left them before
they reached Hester Ann's, went home and went to bed
Two days after the killing, Nancy Lay discovered a stain
on the pillow-cases on which defendant had slept. No
one else had slept on them, and nobody had slept in the
bed since he did. She could not say whether or not it
was blood. The coroner examined them after the in-
quest was over. He testified that he thought the stain
was blood, that he examined for blood stains on defend-

ant, but did not find anything that looked like blood. No witness testified as to noticing any indications of blood on defendant. About half past six o'clock Friday morning, about a mile from one Peacock's, towards whose place defendant was going, he told two witnesses that Printup was lying dead on the railroad; and said he (defendant) was going to Peacock's. About the same time, he asked another if she had heard the news about deceased; did not say how dead deceased was. "At about good daylight," he told another that deceased "was dead as hell"; said he knew it was deceased by his "damned red hat." He told this witness he came from Peacock's, which was about a mile and a half off. He had been working for Peacock, and was at his house on Saturday but was absent on Friday. Peacock and a number of other witnesses (all who testified on the subject) swore that he was of good character, peaceable, industrious and hard-working. No one testified as to any quarrelling or previous difficulty between him and Printup. The father of Printup testified that defendant told him, "They lay the death of Daniel down to me, and the time's coming when I will tell what I know. I never wounded him or nothing." The jury found the dendant guilty, with recommendation to the mercy of the court, and he moved for a new trial on the grounds that the verdict was contrary to law and evidence. The motion was overruled, and he excepted.

W. R. RANKIN, for plaintiff in error.

CLIFFORD ANDERSON, attorney-general, and A. W. FITE, solicitor-general, for the State.