## PATTON *v.* THE STATE.

1. This court can not grant a new trial where the evidence is conflicting; it must do so where there is no evidence to support the verdict.
2. Between conflicting evidence and a total want of evidence lies the debatable territory where this court must determine whether the evidence is of the character demanded by law, and sufficient to sustain the verdict in the particular case under consideration.
3. The law recognizes that there may be evidence pointing to guilt, without that evidence being sufficient to warrant conviction.
4. In testing the sufficiency of evidence this court can not consider the credibility of witnesses, but it may consider the nature of the testimony, and whether or not it should be treated as incredible because purporting to prove facts impossible.
5. Courts and juries are not bound to believe testimony as to facts incredible, impossible, or inherently improbable.   Great physical laws of the universe are witnesses in each case, which can not be impeached by man, even though speaking under the sanction of an oath.
6. In a murder case the identification of the accused as the person who did the killing is of paramount importance, and should be established beyond a reasonable doubt.
7. Such identification may be established by circumstances, like the peculiarity of a track; or the accused may be identified by the 'voice, where the witness shows that the accused had a peculiar voice, or that his acquaintance

with the defendant was so long or so intimate as to enable him to identify the accused by his voice.

8. Where there is nothing peculiar in the voice of the accused, and the witness had only heard the accused speak twice, and that long before the occurrence, identification solely by the voice would leave room for reasonable doubt, particularly when it appeared that the speaking was at night ; that the witness was surrounded by barking dogs ; that the person speaking was some seventy-five yards distant in the woods ; and that the witness did not mention the name of the defendant as the guilty party until the day following, and then testified that he "thought he recognized his voice."

9. The public is vitally interested in the prevention of acts which may require the court to declare a mistrial, and the judge need not wait for an objection, but of his own motion may promptly interfere to prevent or stop such occurrences.

10. Where acts transpire in the presence of the jury which would authorize a mistrial, and the injured party does not move therefor, but only asks the court to rebuke the same, and for an instruction to the jury cautioning them not to be influenced thereby, there is, if the court complies with such requests, a legal, though inadequate cure, and this court can not order a new trial.

FISH and CANDLER, JJ., dissenting. On the trial of a criminal case, where the identity of the accused and his connection with the crime are established by but a single witness, and that witness testifies to circumstances which make it appear that his recognition of the accused at the time and place in question was perhaps extraordinary, but not as a matter of law impossible, it is for the jury to say whether or not the witness has told the truth. This court should never attempt to decide debatable questions of veracity.

Argued October 22, 1902. Reargued January 20, — Decided February 13, 1903

Indictment for murder.　　Before Judge Janes.　　Polk superior court.　　August 4, 1902.

Patton was indicted for the murder of Charley Cuzzort, and was found guilty, with a recommendation of life imprisonment. He excepted to the refusal of a new trial. The other material facts will appear from the opinions following.

*Janes & Hunt* and *Bunn & Trawick,* for plaintiff in error.

*John C. Hart, attorney-general, W. T. Roberts, solicitor-general, Sanders & Davis, Blance, Wright & Tison,* and *J. C. Walker,* contra.

LAMAR, J.　　That a murder was committed is most certain. Every circumstance attending the dreadful affair appears with fullness, and the only question left in doubt was the one of paramount importance, — who did the killing ?

1. It appeared that the main witness for the State, together with his son and the son of a neighbor, went "possum hunting," car-

rying a lantern ; that their dogs had " treed a possum; " that they had just cut down the tree, the "possum had been caught up," and at that moment two or three men appeared on an embankment or cliff some fifty or seventy-five yards away, when one of them inquired whether Mann (the defendant) was there.   The witness twice inquired of Cuzzort, one of the hunting party, what the voice said, answered " no " to the question, went ten steps toward the group who were standing on the cliff, was met by a volley of oaths, ordered to retire, and, on turning to leave, two, three, or five shots were fired, one of which killed the son of the neighbor. It appeared that this witness, on the next day at the coroner's inquest, stated that he thought he recognized the voice as Patton's, and, while he at one time intimated that he could see the outline of a form which was about like that of Patton, placed the identification solely on the voice, swore that he saw a Winchester rifle in Patton's hand, and shotguns in the hands of the other two.   There was testimony that near the place at which the shooting occurred were found several empty shells which fitted the Winchester rifle owned by the defendant ; that the next day, after the rifle, however, had been handled by several parties, the chamber was short of being full, about the number of shells found on the ground.   It is conceded that there were several persons in the party by whom this shot was fired.    Even if Patton had been in the crowd, it did not necessarily follow that he had fired the shot, or that it had been fired in pursuit of a conspiracy, or that he was a guilty participant in the act of the other party.   The mere finding of the shells which would fit the Winchester rifle would not necessarily connect him with the offense ; or even if it was shown that the shells had come from Patton's rifle, the shot might have been fired by some one else.   It did not appear that there were no other Winchester rifles in the neighborhood, nor that other persons did not use cartridges of the same make, size, and number.   This was a circumstance which would have gone very far to confirm the defendant's guilt if there had been other sufficient evidence to connect him with the killing ; but by itself the mere finding of empty shells which will fit a particular pistol or rifle proves nothing, because the shells might fit half a dozen rifles in a neighborhood.    It would have been as proper on that evidence to indict the owner of one rifle as another.

The witness must have referred to his mental state at the time of the killing much of that to which he subsequently swore, because he says that he recognized that the man had a Winchester rifle, and that the other two had shotguns. Confessedly it was impossible for him to have decided whether the gun was a rifle, or, if a rifle, that it was a Winchester. So, too, the testimony that one of the men had on a dirty shirt is not calculated to confirm other parts of his testimony. By a process of exclusion these recognitions of the shirt and the gun are eliminated as being impossible; the size of the man and shells proves nothing, because too many men are of the same size as Patton, and too many guns could use this size shell. The case, therefore, finally turns solely upon the question as to whether the witness could recognize Patton from his voice. He was in the swamp; the moon was shining, but it was dark enough to require a lantern; the tree had just been cut down, and the dogs were barking; the voice from the hillside inquired, "Is Mann (Patton) there?" Had the witness then recognized the voice as that of Patton, he must have been impressed with the folly of Patton on the hillside asking if Patton was in the swamp; and a natural answer would have communicated some such surprise. So far from then recognizing the voice, he testified that he three times asked Cuzzort, "What did he say?" If he could not recognize the words of a stranger, how could he identify the infinitely more delicate tones of a voice he had only heard twice, and never at that pitch? Where the witness is acquainted with the accused, he may be in a position to testify positively to his voice and thus identify the defendant. But where, as here, it appears that there was nothing peculiar in the voice; when the witness was not acquainted with the defendant, and had only heard him speak twice, and that at a considerable period before the homicide; when he had never heard Patton halloa, the circumstances ought to be most propitious to entitle such evidence to any weight. But it is said that there was some evidence, and that the jury having passed on the issue, this court can not review their finding, nor undo what they have done by their verdict of guilty. If there were a conflict in the evidence, we certainly could not interfere. If there is a total want of evidence, we must interfere. Between a total want of evidence and a conflict of evidence there is the debatable ground as to the sufficiency of evidence. The court must determine in each case whether in its

inherent character the evidence is sufficient to show beyond a reasonable doubt that the defendant committed the crime charged.

2–8.   The code recognizes different degrees of evidence, and as to some transactions it provides that there must not only be evidence of the fact, but that such evidence must measure up to a particular standard.   The evidence of one witness is not sufficient to convict of perjury.   Confessions are evidence, but they are not sufficient unless corroborated.   The testimony of an accomplice is evidence, but it is not sufficient unless corroborated.   Evidence which leaves a doubt may be sufficient in a civil case; but evidence which tends to show the guilt of the defendant, while evidence, is not sufficient unless it establishes the guilt of the defendant beyond a reasonable doubt.   Civil Code, §§ 5144, 5197; Penal Code, § 987. It will not do, therefore, to say that, because there is evidence of the guilt of the defendant, the court can not examine further after verdict.   So to hold would be to admit that a verdict sustained by any evidence was right, even though in its character and probative value it did not measure up to the requirement of the law.   This court has always recognized that the greatest weight and consideration should be paid to the verdicts of juries, and in many cases has held that while the verdict was different from what the judges would have rendered as men, the court would not interfere.   So, too, where the evidence was conflicting, it would not disturb the finding, although it might think that the preponderance was in favor of the losing party.   In testing the sufficiency of evidence this court can not consider the credibility of witnesses, that being a matter exclusively for the jury, who note their manner of testifying, and consider the thousand and one things transpiring during a trial, which can not be photographed or transcribed and transmitted to this court as a part of the record.   But while it can not consider the credibility of a witness, it must consider the nature and character of his testimony, whether it is in accord with natural laws, or is improbable, incredible, or seeks to establish facts which are impossible, or which, if not impossible, must in their very nature be uncertain, vague, indefinite, and insufficient to remove reasonable doubts.   Juries act in accordance with this same principle, and often find verdicts contrary to the direct testimony of a witness, because their experience demonstrates that what the witness said could not have been true.   What to our fathers was impossible

is to us matter of course; and while the circle of the possible daily enlarges, yet some things are unchanged and unchangeable.   The great physical laws of the universe are witnesses in every case, and can not be impeached by the feeble voice of man, even though he be speaking under the sanction of an oath.   A conviction could not be sustained by testimony that water of itself ran up hill, or that a distant object was recognized in the pitch dark, or that a witness recognized the voice of a man whom he had never heard speak, or that at night and in the woods he could tell that one seventy-five yards away had on a dirty shirt, or that he could distinguish whether the rifle was a Winchester or a Martini.

We are far from asserting that slight facts may not point to still greater, and may not be welded into a chain of the strongest evidence.   The ingenuity of the human mind nowhere manifests itself more frequently than in drawing correct conclusions from slight circumstances.   Many a man has been convicted of a crime on proof of the identity of tracks; but foot-tracks alone would never be sufficient.   *Cummings* v. *State,* 110 *Ga.* 293; *McDaniel* v. *State,* 53 *Ga.* 253; *Shannon* v. *State,* 57 *Ga.* 482; *Ware* v. *State,* 96 *Ga.* 349.   It must be shown, not only that the foot of the accused fitted into the track, but that there was something peculiar about it, which distinguished it from those of other people.   Too many people wear shoes of the same size to let mere proof that the accused's shoes fitted the track convict him.   It might be that there was nothing peculiar about the track, but that defect in the testimony might be supplied by proof that no one except the defendant, wearing that sort of shoe, had been or could have been in the neighborhood.   And likewise an accused might be identified by his voice.   This case having been reargued, and the record read several times most carefully, we have examined also to see what other courts have done in like cases, and in our search we have found a number of cases in which it has been explicitly ruled that such means of identification might be sufficient. In one it appeared that the witness thus identifying knew the defendant for nine years.   Andrews *v.* Commonwealth (Va.), 40 S. E. 935.   In Givens *v.* State, 35 Tex. Cr. 563, the witness had known the accused "for years."   In Com. *v.* Hayes, 138 Mass. 185, the witness had only heard the accused speak once, immediately before the crime, but testified that "the voice was coarse,

rough, and very ugly." In Com. *v*. Williams, 106 Mass. 63, the witness testified that the voice of the accused was very pleasant. There the court refused to charge that "identification by voice alone, of a person whose voice had been heard by witnesses but once, was insufficient and too uncertain, there being no other peculiarity." While refusing this request, the court charged, and we think correctly, that the voice was a circumstance to be considered with other circumstances of the case. Acting under the practice which obtains in those jurisdictions where the court can express his opinion on the evidence, the trial judge in that case advised the jury that they ought not to convict the defendant on this circumstance alone, if no other circumstances tended to satisfy them that the defendant was the man.

The tones of a voice are so intangible that ordinarily it can not be described. To say that it was the voice of Patton is almost an ipse dixit as to which no issue could be joined, unless there was something extraordinary or peculiar about it. Identification by the voice is in the nature of opinion evidence. That the witness heard some one speak, and understood what he said, is a fact; but where the speaker was not otherwise recognized, it is necessarily a matter of opinion as to who spoke. Here Bomar and Cuzzort both heard the same voice. One says he does not know whose it was, and the other "thinks it was Patton's." Being opinion evidence, it has no value unless the witness can give a sufficient reason for the ground of that opinion. None was given on the direct examination, and on the cross-examination the witness testified that he had no acquaintance with Patton, had talked with him for a few minutes several months before, and had also overheard him speak to a neighbor on the road. This cross-examination, therefore, we think, showed that his opinion was entitled to only the slightest consideration. We do not mean to say that a man can be expected to tell how he recognizes a face, or how he identifies a voice, or how he knows a particular fact. The very wisest might find it difficult to explain the processes of the human mind or to tell how he knows anything. He can testify, however, as to facts, show an opportunity to know, and show that he has been where the mind could receive the impression and acquire the knowledge. He could show that he has so often heard the tones of a voice that, though unable to describe, he was still able to recognize its pecu-

liarities or to identify it as belonging to a particular man. Here the witness not only fails to show how he identified the voice, but testifies to facts which would show that in the nature of things he could not be able to have known that voice with sufficient certainty to identify Patton beyond a reasonable doubt. The witness did not mention that Patton was the man until the next day. He does testify, " After the killing the first one I reported it too was Lum Wood," but he did not then say Patton was the slayer; and Cuzzort, in reply to the question, " Mr. Bomar didn't say anything at all that night about who he thought it was ?" answered, " No, sir." Considering the distance by which the parties were separated, the excitement and confusion, the fact that Bomar, the witness, had never known Patton except most casually, had only met him once for a few minutes and overheard remarks in a conversation with a neighbor, and had never heard Patton speak in a voice like that used at the time of the homicide, we are constrained to hold that the evidence lacks that element which is sufficient to rebut the presumption of innocence, or to show that the defendant was guilty beyond a reasonable doubt. As to this court's duty to reverse where evidence leaves a reasonable doubt as to the guilt of the defendant, see the following cases : *Silvey* v. *State,* 111 *Ga.* 849; *Ballard* v. *State,* 99 *Ga.* 195 ; *Wells* v. *State,* 97 *Ga.* 210 (4) ; *King* v. *State,* 84 *Ga.* 524; *Cummings* v. *State,* 110 *Ga.* 293 ; *Johnson* v. *State,* 61 *Ga.* 305 (4) ; *McDaniel* v. *State,* 53 *Ga.* 253 ; *Shannon* v. *State,* 57 *Ga.* 482; *Laws* v. *State,* 114 *Ga.* 10 ; *Johnson* v. *State,* 73 *Ga.* 107.

9, 10. The deceased was a young boy. The circumstances of the killing were so wanting in every mitigating circumstance, there was such an absence of motive, such a malicious deliberation in the shooting, that it must have appealed profoundly to the heated temper of the community in which the family of the young boy lived. There was nothing needed to arouse the sympathy or to excite the indignation of those conducting the trial; but, during the argument for the State, the shirt of the young boy who had been killed was handed to his mother, and she was requested to take it and show to the jury where the bullets went through, and where the blood had stained the garment. The scene was far more dramatic than when Antony held the garment of Cæsar before the Roman crowd, and with studied eloquence said, " See what a rent the envious

Casca made." Here it was no Antony, but the mother who pointed out the rents and blood-stains; and, bathed as she was in tears and sobbing out her grief before the jury, their indignation must have been kindled to fever heat. And we doubt not that the verdict was greatly influenced by this transaction; and had a motion for a mistrial been made at the time, the court would no doubt have granted it. Nothing in the code has in any way lessened the power of the trial judge to see that cases are conducted in an orderly manner. The constitution guarantees to every defendant a fair and impartial trial. Every litigant is entitled to the same right, and he does not get it where any influence except the law and the evidence is allowed to affect the minds of the jury. Hisses, cheers, demonstrations, improper appeals, argument not warranted by the evidence, and the like, all constitute an impairment of the right to a fair trial. When such things happen, counsel for the injured party is necessarily in a dilemma. Shall he let the trial proceed? The jury may not have been enough influenced by the occurrence to render an adverse verdict; there is at least a chance of success. Shall he ask of the jury to retire, and move for a mistrial? The motion may not be granted, and he feels that the jury would know what he had done in their absence, and to the injury already done might be added whatever unfortunate result might be produced upon their minds by an unsuccessful motion, the making of which they might impute to conscious weakness, rather than to a sole desire to remove the impression produced by the improper conduct. Or shall he press for his mistrial? The remedy is often worse than the disease. The defendant may be in jail. Great time and expense may have been incurred in securing the witnesses; yet he may be still willing to insist on the motion, and it may be granted, with the result that there must be a new trial at the next term, and a loss of the labor and expense and time already consumed, and the far more serious effect on the public mind. Such things ought not to occur. Where possible, they should be nipped in the bud before they have had time to ripen into damage. It is not necessary to wait for either party to object. The court itself has an interest. The public has an interest, and it is a high privilege which the judge has to act on his own motion. Civil Code, § 4419; *Aug. R. Co.* v. *Randall*, 85 *Ga.* 319; *Farmer* v. *State*, 91 *Ga.* 720. Where the court acts without being asked, the remedy is far more effect-

ive, and in most cases will undo what has been improperly done. Such promptitude will generally obviate the necessity of declaring a mistrial. If, however, the court does not act of its own motion, the injured party may take such action as he thinks appropriate. If he asks that the court rebuke what has been done, with an instruction that the jury should disregard the occurrence and not allow it to influence their verdict, but fails to ask a mistrial, this court can not usually grant any further relief. It is true that in *Woolfolk's* case, 81 *Ga.* 551, and in a. few others like it, a new trial was granted though a motion for a mistrial had not been made. But the facts there were extraordinary, and ought not to furnish a test for cases like the one at bar. The defendant Patton may not have wanted a mistrial; and if the court, without any motion to that effect, had declared one, he might thereafter have claimed that he had been in jeopardy, and could not again be put upon trial. We have already shown that we recognize the embarrassment of a defendant under circumstances like those set out; but where he deliberately fails to ask a mistrial, and where the judge does all he is asked to do by way of rebuke to the offending party, and gives instructions to the jury not to be influenced by what has transpired, there is a legal cure for what has happened. In saying this as judges, we know as men that the effect of the painful scene had not been obliterated from the minds of the jurors.

*Judgment reversed. By three Justices. Fish and Candler, JJ., dissent.*

CANDLER, J. It is with reluctance that I dissent from the judgment of the majority of the Justices who presided in this case. That judgment was made up only after long and careful consideration; and did I not feel that the conclusion reached involves a radical departure from the precedents of this court, as well as from the well-settled law of the State, I would content myself with simply recording my dissent, without giving my reasons therefor. In the administration of justice in this State, we necessarily depend, for a proper determination of issues of fact, upon the wisdom and fairness of honest, upright, intelligent, and impartial jurors, and those issues are determined only by the unanimous concurrence of the members of the jury impaneled to pass thereon. The jury are the sole judges of the credibility of wit--

nesses, and it is for them to decide what weight is to be given to the testimony introduced before them.    They see the witness, hear him, consider his demeanor and surroundings, look to his environment and connections, and it is their province in each case, with all this in view, to place upon the testimony its true value. As was well said by Mr. Justice Bleckley, in the case of *Smith* v. *State*, 63 *Ga*. 90 : " Weighing the evidence and finding the truth in an obscure or doubtful case is work that can usually be well done, *best done*, by a jury of the vicinage," and " what they promulgate by their verdict as the value of the whole, and as the ultimate truth of the matter in controversy, ought to be accepted." The jury is presided over by a judge, a man of experience, learned in the law, presumably free from all prejudice, and he is responsible for the correct administration of justice in his court.    He sees and hears the witnesses who testify before the jury, and necessarily forms his own opinion as to the proper weight to be given the testimony of the witnesses sworn in a given case.    When the jury have reached a conclusion as to the truth of a case, and the losing party is dissatisfied with their finding, the judge may, in the exercise of a sound discretion vested in him by law, grant or refuse a new trial.    He may and should, in every case, carefully review the findings of the jury on the facts, and correct any mistake that in his opinion the jury has committed.    Both the jury who find the facts and the judge who reviews that finding are presumed to be competent to perform their respective duties, and moreover to perform them.    That the jury who passed upon the facts of this case, and the judge who presided over its trial, performed their respective duties, I have no doubt; and the only thing left for this court to do is to ascertain, first, if the trial judge erred in any of his rulings which are the subject-matter of complaint; and second, was the evidence offered, from which the jury found the accused guilty, sufficient, if true, to authorize that finding.    The jurisdiction of this court is by the law limited to the correction of errors of law by the courts whose judgments it was constituted to review.    It is in no sense a court of appeals, but in the strictest sense a court of errors.    Only when, as a matter of law, a trial judge errs in holding that a verdict should or should not be upheld, can the Supreme Court properly interfere.    Its power with regard to verdicts has always been thus restricted; and though it has, as in some of

the cases cited by the learned Justice who pronounced the major-
ity opinion, assumed greater power in this respect, it is well set-
tled by many cases heretofore determined by this court that it
should not do so.    When the jury in the trial court have passed
upon the credibility of the witnesses, when they have determined
the truth as to the disputed issues of fact, when they have weighed
the testimony of all the witnesses relative to the questions in-
volved, when they have reconciled conflicting evidence, and when
the trial judge, in the exercise of his discretion has approved their
finding, "this court should not interfere, nor control his discretion,
other than in cases that are strong and unequivocal."    As was
said in the case of *Roberts* v. *State*, 3 *Ga.* 323, " it must be a very
clear case of error in law, or a very naked, bald case as to the facts,
which will authorize this court to control the discretion of the
court below, in a criminal cause, where the jury are made both
the judges of the law and the facts."

In the case now under consideration we are all agreed that the
only ground upon which a reversal of the judgment overruling the
motion for a new trial can be based is that the verdict of the jury
is not supported by the evidence.    The evidence was both direct
and circumstantial.    That a murder, diabolical in its conception
and ruthless in its execution, was committed, no one disputes.
The real point of difference is whether the jury were warranted in
believing the witness Bomar, who swore positively to the identity
of the accused as one of the parties participating in the commis-
sion of the crime.    Although, in the opinion of the majority, it is
said that " even if Patton had been in the crowd, it did not nec-
essarily follow that he had fired the shot, or that it had been fired
in pursuit of a conspiracy, or that he was a guilty participant in
the act of the other party," I venture to suggest, in view of all the
evidence contained in the record, that not one of my brethren would
ever have agreed to a reversal of this judgment had they believed
that Bomar told the truth when he swore that he recognized Pat-
ton "by his voice and size " upon the occasion in question.    This
witness was subjected to a long and minute direct and cross-exam-
ination, and the substance of his testimony was that the accused
called several times to the party of which the deceased was a mem-
ber.    He testified to quite a number of sentences spoken by the
accused, and undertook to quote the exact language used in the

different sentences spoken.    He stated the distance at which he first heard him speak, and then said that he went nearer, to a point some thirty-five yards from the speaker.    The language alleged to have been used by the accused was of such a character as would tend to make a lasting impression upon the mind of any man, especially in view of the tragedy that followed immediately afterwards.    On his direct examination he testified to several opportunities that he had had for becoming familiar with Patton's voice, although on cross-examination he was not clear in his recollection of but two distinct conversations with the accused on former occasions.    Each of the party of three of which the witness testified that Patton was a member was armed with a gun, and a shot from one of these guns killed the deceased.    It is conceded that if Patton was the man who did the talking, as testified to by Bomar, the jury would have been authorized to convict.    Bomar swore positively that he recognized Patton ; that he did not recognize his two companions ; that he could see the figure of Patton " nearly as good as he could see that of the counsel examining him ; " that the moon was shining " nearly as bright as day," and that his general outline and size corresponded with Patton's " mighty well."    He could not identify the face at the distance he was from him.    In answer to the question, " Was there any undergrowth or anything to prevent you from seeing him? " he answered, " No ; there might have been some little bushes ; something like that."    After the killing, the first man to whom he told his story was Lum Wood, and from the context in the record I think it is fairly inferable that the witness meant to say that he told Wood that Patton was the man whom he had seen ; but it appears that the witness was not asked as to the details of what he told Wood, and it would not be fair to say absolutely that he told Wood shortly after the killing that it was Patton's voice that he had heard.    Wood lived about a quarter of a mile from the point where the killing occurred ; and the witness returned to the place where the boy was killed, about four o'clock the next morning.    He testified that one of the men in the party that did the killing was armed with a Winchester rifle, the other two with shotguns ; but he nowhere swore, as might be inferred from the majority opinion, that he recognized the character of these guns by sight ; and I take it from his testimony that he recognized them from their

sound when they were fired, as it is well known to every one at all familiar with the sound of firearms that the crack of a rifle is a very distinct sound from the roar of a shotgun. It appears that at the time of the killing all these guns were heard. The fact that the witness called the rifle a Winchester should not go to his discredit, when we recall the fact that the Winchester rifle is the one in most common use every day, and that in the rural districts not one man in a hundred ever heard of a Martini. In support of Bomar's testimony, it was shown that three empty Winchester rifle shells of 38 calibre were found at the spot where the man stood who fired the shots. When the accused was arrested, he carried a Winchester rifle of 38 calibre, which had a capacity of sixteen shells, and at that time it contained thirteen or fourteen cartridges. The shells that were found at the spot where the shots were fired, and the loaded ones in Patton's rifle, were exactly alike. The marks on both were identical. It is true that it did not appear that there was not another Winchester rifle within miles of the place where the accused lived, but it did appear that the accused was never without his, and it also appeared that, so far as one witness knew, there was not another Winchester rifle in the immediate neighborhood. Upon the direct examination it appeared that the witness Bomar had had ample opportunity to familiarize himself with Patton's voice. Under a long and severe cross-examination, these opportunities were shown to have been less. Under this cross-examination it was developed that Patton's voice was "neither strange nor peculiar," and that it was "not very pretty." This was the fourth time that this witness had testified in this case. In answer to the question, "You suspected that night that it was his [Patton's] voice?" the witness said, as a conclusion of the whole matter, "I knew it was his voice; I could see him; there was not a thing betwixt me and him. I could recognize the man when he was talking. I could tell who the man was from his voice. I looked at him, and after I looked I knew then the sound of his voice." When asked, "Isn't it true that you swore that you did not recognize him except by his voice?" he replied, "I swore that I recognized him by his voice and the size of the man." It is true that on this cross-examination he swore that one of the men, the taller of the three, was in his shirt-sleeves, and that he could not then say whether the men had on caps or hats; that he did see that the man

in his shirt-sleeves had on a colored shirt, or a dirty shirt, and that he could not see whether it was a black shirt or not. The witness appears to have been ignorant and unlearned; but it was for the jury to take all that he said and declare whether or not he was telling the truth. The trial judge and the twelve jurors were eye and ear witnesses of the trial, and were cognizant of all the circumstances attending it. They observed the demeanor of the witness and whatever contradictions there were in his testimony, and they were infinitely better qualified to pass upon its truth or falsity than we can be, who see the case only as it appears in cold type.

I am not unmindful of the rulings of this court to the effect that evidence of tracks alone is insufficient to support a conviction; but they go quite far enough as a limitation upon the power of the jury to say from the proof of certain circumstances whether or not a party is identified as being at a given place at a particular time; and none of the cases go to the extent of holding that when a witness swears positively to the identity of a man from his voice and figure, the jury have not the right to believe him. Reduced to its last analysis, the judgment rendered by the majority must rest upon the idea that the jury were not authorized to believe the witness Bomar, because, as a matter of law, the things to which he testified were impossible. I do not think this position tenable. That it is unusual for a man to recognize voices and figures as Bomar claimed to have done may be conceded; but who can say that it is impossible? It is probably true in the experience of every man that he has on numerous occasions recognized voices, faces, or figures when he could not, had his life depended on it, have told by what means he recognized them,—the only thing of which he was certain was that he did recognize them. So subtle are the workings of the human mind; so elusive the landmarks by which the consciousness guides itself; so fleeting and momentary the touches upon the waxen scroll of memory, that oftentimes all we have left of the mental operation is its net result. We have reached a point, surely and safely; but for the life of us we can not tell over what road we traveled. Who is it that has not heard a voice, with nothing definably peculiar about it, which he would yet be willing to swear to if he heard it again? And so, in the present case, may what we have said be properly applied to the witness Bomar.

He swore, in effect: " I recognized Patton by his voice and the general contour of his figure. He spoke several times. The dogs were barking; and while I could not at first understand his language, I could very plainly hear his voice. While I had only heard him speak on a few occasions formerly, I am very sure that the voice I heard was his." The jury heard this evidence; they looked upon the witness and they believed him, as I am convinced that they had a perfect right in law to do. To lay down any stricter rule would, in my opinion, be to render liable to impeachment every man that lives; for if every man who swears to recognizing another under unusual circumstances were obliged to describe in minuteness the means by which the recognition was made, the most honest could not stand the test.

In much that appears in the very able opinion of the majority in this case I heartily concur. Without in the least disparaging it, however, I must add that in my opinion many of the authorities cited and much of the reasoning adduced go to support my position, rather than that sought to be sustained.

FISH, J. I concur in the foregoing views expressed by Mr. Justice Candler.