McEWEN　*v.* ATLANTA RAILWAY AND POWER CO.

The estimates of the witnesses as to the rate of speed varied.　Some placed it at six miles an hour, which was lawful; another at more than fifteen miles an hour, which was in excess of that allowed by ordinance.　There was no contradiction of the testimony that the plaintiff and two other passengers were jerked and hurled from their seats while the car was rounding a sharp curve.　The physical facts were of more evidentiary value than the opinions of non- experts.　Under the circumstances, estimates that the speed was not improper were insufficient to overcome the presumption arising from the fact of the injury; and the verdict for the defendant was contrary to law.

Argued July 15, — Decided August 12, 1904.　Rehearing denied August 12, 1904.

Action for damages.　Before Judge Reid.　City court of Atlanta.　January 4, 1904.

Mrs. McEwen sued the Atlanta Railway and Power Company for injuries alleged to have been received by being thrown from her seat in a street-car, in consequence of the defendant's negligence in running at a high and dangerous rate of speed around a

sharp curve. The petition alleged, that the motorman seemed to lose and did lose control of the car, and, in going down grade towards the Nelson street bridge, allowed the car to run at a very unusually high and dangerous rate of speed; that it was running at the rate of thirty-five or forty miles per hour, and, while running at this high and dangerous rate of speed in the negligent manner before alleged, it reached a sharp curve, causing it to make a quick jerk or swing to the right, the force of which threw the plaintiff from her seat and across the aisle of the car and caused her to strike against a seat on the opposite side of the aisle and to fall, thereby inflicting injuries described; and that her injuries were the result of the defendant's negligence in allowing the car to run and in running it at such a high and reckless rate of speed and in such a dangerous manner. By amendment the plaintiff struck the allegation that the motorman "did lose" control of the car, and alleged that the defendant was running the car at a greater rate of speed than fifteen miles an hour, in violation of a city ordinance, which limited the rate to ten miles an hour within a quarter of a mile from the Union Passenger Depot, and to fifteen miles an hour beyond that distance. At the trial, most, if not all, of the passengers on the car were introduced as witnesses. The plaintiff testified, that the car was "running very fast,"—"so fast that when it turned the curve going over the Nelson street bridge, there was a right smart check up,—didn't stop, and as it struck the Nelson street bridge it was with such force that it threw me off my seat, and I struck the seat opposite and hurt my hip very bad, and I kind of rebound and struck on the other side, and a lady sitting by me fell on top of me." She was bruised, rendered unconscious, and sustained various injuries described. She testified further: " I haven't no knowledge how fast the car was going,—what speed it was going I don't know." Miss Smith testified, that she was sitting on the same seat with the plaintiff, and that "the car as it was turning this curve threw her off the seat we were on into the aisle, across over to the other seat. I fell directly on top of her. . . I do not know how fast that car was running." The plaintiff's son testified: "I was on the front platform. . . Up to Nelson street the car was running about as usual, but after it turned from Walker street into Nelson street and on,—well, I

suppose twenty or thirty feet this· side of the first curve on Nelson street, before you get to the curve at the bridge, it was running rather fast, but then it seemed to get from under his control, suddenly got unusually fast, and then when it struck the first curve it threw the people around the car considerably, but when it hit the second curve, that was when the accident occurred.    At the time it hit the second curve the car must have been running fully fifteen miles an hour, possibly more than that. . . It didn't throw me out,— came very near it.   I caught and saved myself."   It threw from the car another man, who was standing on the steps.   "How far the first curve was from the bridge I can't say exactly,— something near 150 feet, I suppose. The motorman seemed to have lost control of this car after he left 20 feet [beyond] the first curve. . . It was going something like fifteen miles an hour, I should think.   How long it took to run from one curve to the other I can't say,— can't approximate it.   How fast a car has got to run to go fifteen miles an hour I can't say.   Without a man does not sit and figure it, he is likely to go wrong. . . No person can tell exactly how quick. . . . To run from one curve to the other I don't hardly think it would take two minutes,— well, not hardly a minute.   I suppose it took half a minute.   If I had taken my watch out and looked at the second hand, I don't think it would have been more than half way round· until it struck that second curve." Another witness testified:. "The car was going just like driving my horse.   I drive my horse many mornings and catch the car. When it went around, it shocked all of us a little.    The car was going just about the speed of what I call a common trot for a horse when driving."   It was raining, "the car slipped, and when it went down the bend it turned.    . I can't tell the reason the car slipped."    Another testified: "When we turned the curve on Nelson street, going down towards the bridge, it was a damp, rainy morning, and the motorman could not control the car, and it struck the curve pretty heavy and threw everybody down in the car. . . I don't think it was going above the average rate there.   It slipped after it commenced sliding; it struck the curve too hard. . . The track was so slick that the car was sliding.   It was sliding at a very rapid rate as it struck the curve.   I think it was. . . I don't know enough about the

running of cars to know whether it was 25 or 30, or how fast. It was going at a pretty rapid rate at the time it struck the curve, it was going fast. He had the brake on, trying to control the car, and he could not control it, and that made it go jostling. It was a sort of jar from the time it commenced sliding until it struck the curve. . . It was running at a higher rate of speed than usual. I think it went some faster. It did not sound like it was running; it sounded more like sliding. . . I could not swear whether it was running or sliding. . It felt and sounded like it was sliding. . . I don't know whether [the speed] was above the average rate or not. . . What the motorman was doing to stop the car I could not say, but he was trying to stop it. It looked like he was doing everything he could. I don't know as I could tell exactly. I was busy with myself. . . I could not tell what it would take to stop one under the circumstances. . . I don't know whether he reversed the car when he tried to stop it." Another testified that he did not think the speed was very unusual when the car struck the curve. " When it came to the curve the car swung around the curve. There was nothing unusual to attract my attention. I was reading my newspaper, and I looked around and the lady was at my feet. . . I was not thrown off my seat." " The cause for it, I suppose, was the swaying of the car as it went around the curve. . . It slants down toward the bridge." Another testified : " Coming down to the Nelson street bridge the car was running at the average speed that we come around there usually. I had been coming in on that line for several years, and I didn't notice any excessive speed. Approaching down to the Nelson street bridge there is a grade. . . When we struck the curve at the foot of the bridge the car slipped around the curve pretty lively. It jerked the car, jolted it considerably, . . and she fell out in the aisle. . . At the time we struck the curve the car was going pretty lively ; it was slipping; it had been slipping, I should judge, 20 feet, or 25. . . I do not know, I should judge, though, that right where Mrs. McEwen fell off into the aisle, the car track is practically level. . . There is some grade crossing the bridge. . . When the slipping came, it slipped instead of running, and slided pretty lively. If it goes to slip at all, it necessarily slips pretty lively; you can't help it." A policeman testified : " I don't think it was

running over 12 miles an hour, may be not that fast quite." Another witness testified: "It was a damp morning, and, as the car approached the corner of Walker and Nelson streets, the motorman speeded up his car so it would go around a curve. The car went around the curve and moved along all right at the speed it had to go around the curve.    Just before it got to the bridge it was a slipping and slipping.    When he speeded it up, he bumped us around lively.    I was on the front platform.    Just before he reached the curve, where it makes into Nelson street bridge, he reversed the current, after speeding it up, — reversed it so it wouldn't go too fast around the curve.    Just before he came to the curve he speeded it up. . .  When it hit the curve right at the end of Nelson street bridge, it hit it with force enough to just knock us around, — not enough to hurt those on the front. . . Don't remember seeing a gentleman knocked off out there. The car was running, at the time it struck their curve there, I think, about 7 or 8 miles an hour.    I don't think the car could get up very much speed that morning, because the track was too slick.    The fact that the track was slick was why he couldn't control the car, I think.    He put on his brakes to control it. . . The wheels wouldn't turn on the track, but slipped. . . While I am not an expert as to speed, I say it was not going more than 6 or 7 miles an hour at its highest speed."    Whether the motorman reversed the car at the time of the accident the witness was not certain.    The plaintiff's son testified, that the only effort he saw the motorman make to stop the car was that he brought his hand-brake lever around one time, between the first curve and the bridge; he had an opportunity to see what was being done, and was paying close attention.    At the foot of the bridge "there is a little grade.    There was nothing to cause the car to be slipping, except the speed it had been started, that I could see."    The plaintiff introduced in evidence an ordinance of the City of Atlanta, providing that "The running speed of street railroads in the City of Atlanta shall not be at a greater rate than ten miles per hour within a radius of one quarter of a mile from the northeast corner of the Union Passenger Depot, and not greater than fifteen miles per hour beyond said radius."    No testimony was offered by the defendant. The verdict was in its favor.    The plaintiff moved for a new trial, on the ground that

the verdict was contrary to law and the evidence, and because of the discovery of a witness who would testify that the car was running at a rate not less than fifteen miles an hour.    The court refused a new trial, and the plaintiff excepted.

*Westmoreland Brothers,* for plaintiff.    *Rosser & Brandon, Walter T. Colquitt,* and *Ben. J. Conyers,* for defendant.

LAMAR, J.    The public demands rapid transit, and passengers can not recover for damages occasioned by the jolts and lurches inevitably caused by running around curves at a proper rate of speed.    *Augusta R. Co.* v. *Renz,* 55 *Ga.* 126 ; *Macon R. Co.* v. *Moore,* 99 *Ga.* 230 ; *Ball* v. *Mabry,* 91 *Ga.* 783 ; *Crine* v. *E. T. Ry. Co.,* 84 *Ga.* 651, 657 ; *Wynn* v. *City & Suburban Ry.,* 91 *Ga.* 357 ; *Ayers* v. Rochester Ry. Co., 156 N. Y. 104 ; *Hite v.* Metropolitan St. Ry. Co., 130 Mo. 132 ; *Wilder* v. Metropolitan St. Ry. Co., 41 N. Y. Supp. 931, affirmed, 161 N. Y. 665 ; *Reber v.* Pittsburg Traction Co. (Pa.), 36 Atl. 245.    But for a street-car to round a curve at a rate which threw three passengers from their seats into the aisle proclaims that, regardless of ordinance or estimates, the speed was at that point improper.    Acts speak louder than words.    The undisputed physical facts declare the speed to have been unsafe, in terms too certain to be disproved by mere opinion evidence of non-experts as to the rate at which the car was moving.    *Patton* v. *State,* 117 *Ga.* 230 (5).    It is true that several of the witnesses said they did not know how fast it was running ; others that "it was not unusual ;" another, "at a jog trot ;" another, "not more than six or seven miles an hour ;" others, "pretty lively," "very fast," and "unusually fast ;" and another, "fifteen miles an hour, possibly more."    If there were nothing except these contradictory estimates, a verdict finding that the car was running more than fifteen miles an hour or less than six could have been sustained.    Or, if no one had fallen except the plaintiff, it might have been concluded that her injury had been due to a fall occasioned by her previous sickness, some sudden accession of weakness, or by some cause other than the negligence of the company.    But when another passenger on the same seat and next to the window, and still another in a different part of the car, were likewise thrown into the aisle, there remains no room for doubt that the speed was improper and unsafe.

Mere estimates are not sufficient to overcome the presumption arising from the injury, when coupled with the additional undisputed fact that two other persons were so jerked and hurled as to be thrown from their seats when the car ran round the sharp curve.    A new trial should have been granted.

*Judgment reversed.   · All the Justices concur, except Fish, P. J., and Candler, J., who dissent.*

· FISH P. J.   In my opinion, there was evidence to authorize the verdict, and the discretion of the trial judge in refusing to grant a new trial should not be disturbed.

CANDLER, J.   If it be conceded that the falling of the passengers into the aisle of the car was caused by the speed of the car, and that only an excessive and negligent rate of speed could have had that effect, the decision of the majority in this case is undeniably correct.    This, however, was for the determination of the jury. The only "physical fact" apparent was that the passengers fell; the cause of that fact was the real point in issue.     Passengers on a street-car rounding a curve are frequently thrown off their balance through no fault of the employees in charge of the car, and while the car is running at a lawful rate of speed.    I agree with the trial judge that "the question involved was one of pure fact;" and my views in this case are based upon those expressed in the dissenting opinion in *Patton* v. *State*, 117 *Ga.* 239.