The evidence was insufficient to support the verdict finding the defendant guilty of rape, and the trial court erred in refusing a new trial.
 No. 15577. OCTOBER 9, 1946. *Page 366 
Tommy Oakes, who was jointly indicted with Luke Carter, was convicted of rape. His motion for a new trial was overruled, and to this judgment he excepted.
The State's evidence tended to show the following facts: On February 14, 1946, the prosecutrix, who was twenty-six years old, came to Atlanta with her husband. He had just been discharged from the Navy and made the trip to purchase civilian clothes. They registered in a hotel on Pryor Street; and after they had been shopping and the husband had changed from service to civilian clothes, they left the hotel late in the afternoon and rode in a cab to a cafe on Ponce de Leon Avenue. While there eating sandwiches and drinking beer, they were approached by Carter, who was jointly indicted with the defendant Oakes. Carter recognized the prosecutrix's husband and introduced himself and Oakes. Both defendants sat down at the table with the prosecutrix and her husband. Oakes and Carter produced a bottle of whisky, began drinking, and offered the prosecutrix and her husband a drink, which was refused. Later Carter offered to drive them back to their hotel. The parties left in a cattle truck with Oakes driving. They had proceeded four or five blocks when Oakes stopped at a place called Campus Castle. Everybody got out of the truck and went inside. The prosecutrix and her husband drank coffee; the defendants had several drinks of whisky. When they left Campus Castle, Oakes and Carter were drunk. The prosecutrix's husband suggested that he be permitted to drive the truck. All four of the parties got into the driver's seat of the truck, with the prosecutrix's sitting in the lap or between the legs of Carter. The prosecutrix's husband drove back to the hotel without being involved in any sort of accident. He stopped the truck in front of the hotel, got out, and went around on the sidewalk to open the door for his wife.
Occurrences thereafter are related by the prosecutrix as follows: "When we got to the hotel my husband got out and went around to open the door for me to get out, and when he did that Oakes went under the steering wheel and he started off, and it all happened so quick, and Mr. Carter shoved me over in the middle like that, and I started screaming and he cussed me and said, `You do that one more time and I'll kill you,' and he drawed his cane back, walking *Page 367 
cane, and he said, `You're not getting out of here,' and he drove on and he started to make a stop, I don't know where. I don't know anything about Atlanta, and when he started to make the stop I screamed and he ran over two or three more stop lights, and he just kept going, and they had this bottle and they started trying to make me drink out of the bottle, and I would just put it up to my mouth and wouldn't drink any, and when he found I wasn't drinking, Carter slapped me, and he grabbed me by the leg and the print of his finger is on my leg. I don't know where we went. It was supposed to be Stone Mountain, and when we went in we set down — well, every once in a while along the way, I don't know how much, I wouldn't drink much when I did drink, maybe five or six times I did that. They started to slapping me and that's the only thing I could do, and they was holding me. Yes, I was afraid, and I reached over Carter and tried to open the door and he started cussing me, and he said, `If you do that again, I'll put you out here where nobody can find you,' and that's when I was scratched. Carter held me. These cuts right here with their fingernails, and one place there on my hand. I started trying to get out of the truck, force my way out, and I couldn't do that, and when we got to the edge of town, I said, `My husband will have the cops on you,' and after we got to Stone Mountain we set down at this bar and one was on each side of me, and they give this boy a bottle of whisky and he poured out three glasses almost full, about that much in the glass, and they had my hands on each side of me holding them like that, and was after me to take a drink, and I said, `How do you think I am going to drink and you holding my hand?' and they turned my hands loose, and I knocked the glass over, and so I saw a man over there with a badge on, and I said to him, `Please take me away and lock me up or do anything,' and he said, `Sober up, sister, and you'll be all right,' and so I ran out the door and they ran after me and caught me and pulled me back in the truck, and so they went on and I didn't say much more to them, and I begged them to take me home, and they said, no, they wasn't taking me home. I didn't know where we was going, but we came over a dirt road and the first place I recognized was Williams Drug Store down here, and we went on out to a house, and they took me out and when we got in there they set me down in a rocking chair and they poured out a drink and tried to make *Page 368 
me drink it and I wouldn't do it; and so they went back in the kitchen and poured a glass of something and brought it back in there and said, `Drink this,' and I said, `I'm not drinking anything,' and so Carter got behind me like this and held my head back like this, and Oakes had my mouth this way and he poured it down me. And there was three men in the house and a girl, and they was all in bed, and they said, `Get out of bed,' and the girl never did get up out of bed. No, I didn't see whether she was dressed or not, just those three guys in bed. They was naked. I don't remember anything after they poured that stuff down me. I remember looking at this bed, and one guy was getting in bed with this girl, and I don't remember anything after that until the next morning about daylight when they made this stop light at Pig and Whistle and I was in the back seat of a Ford car. Mr. Oakes was the only one with me then. I was in the back seat of the car and we was at Pig and Whistle, and he drove over to this Campus Castle. That is the same place I had been in the night before. So we went in there and I had a cup of coffee and I asked this Mr. Wright, or whoever the owner of the place was, did he have a wash room where I could wash the blood off of me, I had blood all over me, and he said, no, he didn't. We drank the coffee, and he was very nice at the time, and so we got in the car and I asked him would he stop at the Greyhound Bus Station, for I knew Uncle Otis worked there, and I thought I could get way from him there, and we went on down to the bus station and I went into the rest room and stayed two or three minutes and washed my face and hands and came back out, and Mr. Oakes was standing at the door, and he grabbed me by the arm and said, `Come on, and I'll take you back to your husband,' and when we got in the car, he said, `Are you going to say anything about it?' and I said `No,' but when I got near the hotel I said, `You guys will pay for this,' and I got out and run into the hotel and my husband was calling the patrol. . . I don't remember anything after I went down to Mr. Oakes' house and saw those people there until I told you I got back in Atlanta. I didn't have intercourse with Mr. Oakes in Atlanta after I came to myself at the Pig and Whistle the first time. If they had it, it was before that time. I don't remember any intercourse I had any time."
On cross-examination the prosecutrix testified, in part, as follows: "We didn't stop any place before we got to Stone Mountain *Page 369 
until we drove in that place at the foot of Stone Mountain. There was several customers in there. I remember seeing two ladies. They were customers, and there was some men in there. I did make alarm that I was being imposed on. I went to this guy that had a badge on him and asked him to help me, and he just laughed when I asked him to help me, and he said, `Sober up, sister, and you'll be all right.' I didn't talk with those ladies there. I didn't talk to the men that run the place. The only thing there was some other guy standing there, and I said, `Please call the cops for me,' and he laughed and said, `You're in Stone Mountain,' and I started crying, and Carter caught hold of me, and I ran up out the door and I was still crying. They put me back in the truck. We came over a dirt road to Lawrenceville. We didn't stop anywhere along that route. We didn't have car trouble and no motor trouble. They didn't give us a drink. They poured it down me. Carter walked behind me an caught hold of my head and mouth, and Oakes poured it down me. I hollered. When these guys started getting out of bed, I started running and when I got to the door the door was locked, and they caught me and brought me back in there and set me down in this rocking chair, and that's when they fixed me up. I had taken a drink at Stone Mountain. They poured out a glass and give it to me to drink and I knocked it over. It was the next morning about Pig and Whistle in Atlanta when I come to myself. . . I remember going to Wright's place where I was the night before. I was conscious then. I didn't eat anything; I drank a cup of coffee. After we left that place Tommy Oakes drove me by the bus station. It was daylight when we got to the bus station. There was two girls in the rest room, and I asked them would they go out and call the cops for me, and they went out and I didn't see them any more. No, sir, I didn't see the ticket man, and when I walked out of the place Mr. Oakes said, `Come on, and I'll take you to your husband,' and we went on and he said, `Are you going to tell your husband,' and I said, `No.' I did not stay around the station at least thirty minutes. I was in there two or three minutes. I washed my face and hands and come back out. That is not true that I stayed long enough for Tommy to go in the barber shop and get a shave and a hair cut and massage, for I was in there only two or three minutes. I only washed my face and hands." *Page 370 
The State's evidence further showed: That, after the prosecutrix was driven away from the hotel, her husband called the Atlanta police department and the State patrol, giving them a description of the truck and the parties, and stating that his wife had been kidnapped; that, when the prosecutrix returned to the hotel she related, when questioned by her husband, that she did not know whether she had had an intercourse. Her husband then took her to Grady Hospital for an examination. She was examined by a doctor, who testified that in his opinion there had been an intercourse within six hours of the examination. The doctor found scratch marks on the prosecutrix's forearms and abrasions and contusions of the right knee and right foot. He found no other signs of injuries on the prosecutrix's body. The prosecutrix appeared to be in a stupor, taking only when asked questions, but the doctor was unable to say whether she was intoxicated.
There was evidence to the effect that the prosecutrix's clothing was torn and there were several spots of blood and other substance on the clothing. There was evidence that on the afternoon of the day of the alleged crime, Oakes was arrested and voluntarily stated, when informed of the charge against him, that he had not raped the prosecutrix but that he had twice had intercourse with her, once in Gwinnett County and again the following morning in Atlanta.
The defendant contended that on the night of the alleged crime he, Carter, the prosecutrix, and her husband had been drinking; that in driving back to the hotel, the prosecutrix's husband, just before reaching the hotel, ran the truck into a light post, creating considerable noise, breaking the right-door glass of the truck, and injuring and bruising her; that her husband became frightened and ran into the hotel to change into his Navy uniform to avoid arrest; that the prosecutrix then insisted that they drive away from the scene of the accident; that without protestation from her they left the scene of the accident and proceeded to Stone Mountain, where the defendant Carter and the prosecutrix left the truck and went into T. W. Johnson's place; that there all of them had several drinks of whisky, with the prosecutrix willingly participating; that when they left this place the truck was skipping, and they then proceeded to Lawrenceville to get a car to return the prosecutrix to Atlanta; that they stopped at the defendant's home in Lawrenceville for a *Page 371 
while, and then the defendant and the prosecutrix left in an automobile and returned to Atlanta; that on their return they again stopped at the Campus Castle and went inside and both took a drink of whisky; that the prosecutrix wanted to go to a rest room, and there being none at the Campus Castle, he took her to the bus station in Atlanta, and while she was in a rest room he got a shave and a massage in a barber shop nearby; and that he then returned her to the hotel.
George P. Wright, a witness for the defendant, testified: That he was employed at the Campus Castle in Atlanta; that on the night of February 14, at about 10 o'clock, he saw Oakes, Carter, the prosecutrix, and her husband in the Campus Castle; that all of them were in a friendly mood and all of them drank whisky from a bottle which the prosecutrix took from her purse; that he saw the prosecutrix offer one of his customers, a man named Tuck, a drink, and she insisted that the witness take a drink, but he declined; that the following morning, before the witness went off duty, the prosecutrix and Oakes came back into the cafe at about 5 o'clock; that "they ordered two cups of coffee with cream and said `Black, no eats.' They did have an orange juice. I saw them drink that orange juice. I gave them two empty glasses, and they taken a drink and divided the orange juice and made a cocktail out of it. I saw them take another drink. She still had the whisky. I couldn't say who poured it in the glasses. She set it on the counter, and I was busy and I turned around and asked them to take it off of the counter, and she put the stopper in the bottle and put it in her purse and asked me to use the rest room again. She walked back just as normal as anyone could; well, only on account of drinking I should say. She come back and asked me to have a drink again and I told her I couldn't take it, and about that time the girl that worked there, we was ready to go out, and she said, `George, are you not going to have a drink,' and I said, `No, I'm going home and go to bed,' and I left them both sitting there talking. I didn't see anything about her conduct that indicated that she was in distress or doing anything that was not entirely agreeable to her. She did not make any complaint to me about being mistreated in any way by her company."
Hollis Tuck testified: That on the night of February 14 he was in the Campus Castle cafe as a customer, saw Oakes, Carter, the *Page 372 
prosecutrix, and her husband when they came in the cafe at about 10:30, soon after the witness had gone in to eat supper; that he saw all of them take drinks, he was offered a drink, but he refused it.
T. W. Johnson testified: That he was formerly on the county police force but now operates an eating place at Stone Mountain; that between 11 and 12 o'clock on the night of February 14 Oakes, Carter, and the prosecutrix came into his place of business; that all of them were in a jovial mood; that they stayed in his place between forty-five minutes and an hour; that there were three or four other couples in the place at the time; that when Oakes, Carter, and the prosecutrix came into his place they ordered chasers and glasses; that he served them in a booth and had a drink with them; that "nobody made any complaint they was in distress. They just all looked like they was drinking pretty heavy that night. They all walked out the door together and got in the truck. They didn't grab her and put her in the truck. They walked out the door together and walked on out the porch, and I saw them get in the truck. None of them was drunk, but they was drinking."
C. A. Johnson testified: That he was in his brother's place at Stone Mountain on the night of February 14 when Oakes, Carter, and the prosecutrix came in; that he "saw them come into the place. I didn't notice the car they came in. They came in the side door. All three of them was together. I didn't see anybody apparently mad at the other, and neither of them appeared to be in distress. There was nothing out of the way happened. There was maybe four or five other couples in there at the time and there was nothing happened out of the way at all. This is the lady there, with the fur coat on. I didn't see her make any complaint to any one about the manner she had or was being treated. She was laughing and talking. They was drinking. I had a drink with them myself and everybody drank together. I did not see anybody force any drink on her. I had two drinks, one at the first booth over on the left side of the building and one at the counter. I saw her take a drink. All four of us had a drink at the table. I just saw her take one drink. She had the whisky in her pocketbook, a fifth."
William A. Doster testified: That he works in a barber shop at the Greyhound Bus Terminal, his hours being from midnight to *Page 373 
8 a. m.; that on February 16 an officer carried the defendant Oakes to his home for the purpose of identification; that at that time he identified Oakes as being a man he worked on on the morning of February 15 just before he went off duty. The witness further testified: "I worked on Tommy Oakes, the boy that's sitting over there at the table. I couldn't say definitely the time he got to my shop, but it was pretty close to 7 o'clock. It wasn't too long before I was to go off my shift. I done a few men after him. I just couldn't say how many. It was between 6 and 7, I'd say. He came in there as a customer, and I was the one that actually did the work. I gave him a shave, a facial and tonic. That is what is sometimes called a massage. I tried to sell him a shampoo before I started shaving him, and he told me he was in a hurry, and when I raised him up I tried to sell him again, and he told me there was a lady waiting for him, and he pointed out the door and there was some lady out there, I couldn't say who she was or what she looked like or anything. I just looked out the door across where the card stand is, straight out from the barber shop door, and saw a lady. There was a lady on duty there at that time. There's a lady there all the time on duty. He said, `There is a lady waiting for me,' and he pointed out the door, and there was some lady standing at this card stand, and I just looked up at her and went on about my business. I didn't pay close attention to her. They have got people on duty in the ticket office all the time. I couldn't say how many was on duty there that morning. There are always military police, shore patrol and police, walking around in the lobby."
A police officer testified for the State: That during the course of his investigation he undertook to check the defendant's statement with reference to a wreck on Pryor Street; that he found the light post referred to by the defendant in his statement when he was arrested in Gwinnett County on February 15; that the light post showed evidence of having recently been struck by an automobile; that there was glass on the sidewalk and scars high up on the post; that he examined the truck and found the right window glass broken and the right side of the truck damaged.
Four witnesses testified as to the good character of the prosecutrix. *Page 374 
The evidence in this case is so voluminous as to prohibit its being set forth in detail; but incorporated in the foregoing statement of facts is the evidence most favorable to the State's case.
This conviction rests on circumstantial evidence. In such cases the law provides: "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." Code, § 38-109.
Peculiarly applicable to this case is the language used in the following excerpts from decisions of this court. In Patton v.State, 117 Ga. 230 (43 S.E. 533), it was held: "The law recognizes that there may be evidence pointing to guilt, without that evidence being sufficient to warrant conviction. In testing the sufficiency of evidence, this court can not consider the credibility of witnesses, but it may consider the nature of the testimony, and whether or not it should be treated as incredible because purporting to prove facts impossible. Courts and juries are not bound to believe testimony as to facts incredible, impossible, or inherently improbable. Great physical laws of the universe are witnesses in each case, which can not be impeached by man, even though speaking under the sanction of an oath." InSimmons v. State, 99 Ga. 699, 703 (27 S.E. 755), Chief Justice Simmons said: "It is held that in such cases the testimony of the person alleged to have been raped should always be scrutinized with care; and when there is much in the facts and circumstances in evidence to discredit her testimony, it should be deemed insufficient to sustain a verdict of guilty; and hence it is that courts of review, while generally reluctant to disturb a verdict where there is any evidence to support it, frequently set aside verdicts in cases of this character, even though supported by positive and direct evidence." And in Peters v.State, 177 Ga. 772, 775 (171 S.E. 266), using language very appropriate to the facts of this case, the court said: "The accused admitted that he had sexual intercourse with the complaining woman, but he asserted that it was done with her consent. The evidence against the *Page 375 
accused, if believed, would support the verdict. However, it is of such extraordinary character that it bears on its face the earmark of the unbelievable."
The evidence in this case was not sufficient to exclude "every other reasonable hypothesis save that of the guilt of the accused," and the trial court erred in overruling the motion for new trial.
The special grounds appear to be without merit.
Judgment reversed. All the Justices concur.