A01A0294. HULSEY v. NORTHSIDE EQUITIES, INC.
(548 SE2d 41)

MILLER, Judge.

Plaintiff Phyllis G. Hulsey brought this tort action against Northside Equities, Inc. d/b/a the adult bar, Ponytails Lounge, seek-

---

ing to recover for the tragic death of her 17-year-old daughter. On a rainy January night in 1992, Christy Lee Hulsey was struck and killed by an intoxicated driver, Rebecca June Greene. Northside's liability was predicated on the Dram Shop Act, OCGA § 51-1-40, and also on a common law general negligence claim stemming from the alleged assumption of a duty of care. Summary judgment was granted to Northside on both claims, and plaintiff appeals. We hold that the Dram Shop Act preempts any common law liability for the server of alcohol except under its own terms, but that the scientific evidence of the driver's blood alcohol level in this case creates a genuine issue of material fact on the Dram Shop Act's crucial issue of whether Greene was noticeably intoxicated at the time she was served her last drink by Northside. Consequently, we affirm in part and reverse in part.

1. When reviewing the grant or denial of a motion for summary judgment, this Court conducts a de novo review of the law and the evidence, construing that evidence and all reasonable inferences and conclusions therefrom in the light most favorable to the nonmovant.[1] In passing on a motion for summary judgment, however, a finding of fact which may be inferred but is not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists.[2]

The following history is undisputed: Greene, age twenty-five at the time, worked as a nude dancer at Northside's adult bar four days a week from 11:30 a.m. until 8:00 p.m. She was permitted but not required to consume alcoholic beverages during her shift. Usually, her boyfriend Gary would drive her to work or else she would take a cab.

On January 2, however, Gary was unable to take Greene to work. Greene felt it was too late to wait for a taxi, so, despite having smoked a joint of marijuana, she took the keys to Gary's car and left. Throughout her shift, from her noon arrival until 6:30 p.m., Greene admittedly consumed four or five Bacardi cocktails, one of which she shared with another dancer. She received her last drink at 6:30 p.m., telling Northside staff she wanted no more alcohol because she was driving. At her request, Greene was served nothing further.

It was raining and dark shortly after 8:00 p.m. when Greene and another dancer left Northside in Gary's car. Greene did not drink any more alcohol or smoke more marijuana while driving the car. She exited Interstate 75 northbound at Delk Road rather than Windy Hill Road, her ordinary route to Gary's apartment on Winterset Parkway.

---

[1] *Desai v. Silver Dollar City*, 229 Ga. App. 160, 163 (1) (493 SE2d 540) (1997) (whole court).

[2] *McElroy v. Cody*, 210 Ga. App. 201, 202 (435 SE2d 618) (1993).

Greene got off the ramp, claimed she got over a lane, and was going down Delk Road when "all of a sudden [her] windshield was busted." According to the incident report, the accident occurred at 8:36 p.m. when the intoxicated Greene failed to merge left as her lane from the exit ended, then drove up on the shoulder of the road, and struck Christy Lee Hulsey from behind as she was walking east. Greene was transported to Kennestone Hospital where a blood sample was drawn. Greene's blood tested positive for ethyl alcohol at 0.18 grams percent and positive for marijuana, and she subsequently pleaded guilty to vehicular homicide and driving under the influence of alcohol and/or drugs.

2. Under OCGA § 51-1-40, the consumption of alcoholic beverages, rather than the sale, serving, or furnishing of such beverages, is deemed the proximate cause of any injury, including death, inflicted by an intoxicated person on any person, except as otherwise provided in that Code section.[3] And whoever sells, furnishes, or serves alcoholic beverages to a person of lawful drinking age generally "shall not thereby become liable for injury, death, or damage . . . resulting from the intoxication of such person, including injury or death to other persons."[4] Nevertheless, one who "knowingly . . . sells, furnishes, or serves alcoholic beverages to a person who is . . . in a state of noticeable intoxication, knowing that such person will soon be driving a motor vehicle,"[5] may become liable for injuries resulting from such intoxication when the sale, furnishing, or serving is the proximate cause of such injury or damage.

In support of its motion for summary judgment, Northside adduced the affidavits of its employees of that day, purporting to demonstrate by direct and uncontradicted evidence that Greene was not noticeably intoxicated when she was last served a drink around 6:30 p.m. nor when she left the bar after 8:00 p.m. Specifically, one bartender thought Greene was not intoxicated at 5:00 p.m. when he served her a drink. To the waitress who served Greene a cocktail for the last time at 6:30 p.m., Greene seemed fine. When another waitress served Greene mineral water "late in the day[, Greene] did not appear drunk to [her] at that time." At about 7:30 p.m., the valet spoke with Greene, who seemed sober at that time. Another dancer saw Greene at approximately 7:45 p.m., and she "did not seem intoxicated. . . ." The "shooter girl" had a conversation with Greene right before the shift change, and Greene "did not appear to be intoxicated

---

[3] OCGA § 51-1-40 (a); *Birnbrey, Minsk & Minsk, LLC v. Yirga*, 244 Ga. App. 726, 727-728 (1) (535 SE2d 792) (2000).

[4] OCGA § 51-1-40 (b).

[5] Id. The trial court concluded a fact issue existed whether Northside knew Greene would soon be driving, and no cross-appeal challenges this conclusion.

. . . at all." The day manager walked Greene to Gary's car and "wasn't concerned because she was very lucid and didn't appear to be intoxicated in any way."

In opposition to Northside's motion, plaintiff showed that Greene drank only at work and did not drink every day; she had no prior alcohol-related moving violations; she pleaded guilty to vehicular homicide and driving under the influence of alcohol and/or drugs based on the tragic accident resulting in the death of Christy Lee Hulsey that occurred within 30 minutes of her driving away from Ponytails; and the Georgia Bureau of Investigation determined her blood alcohol level was 0.18 grams percent, based on a blood sample drawn no later than 10:00 p.m. Plaintiff also adduced the affidavit of Joseph L. Burton, M.D., an expert concerning the absorption and metabolism of ethyl alcohol by persons who drink alcoholic beverages. According to Dr. Burton, full absorption of a typical mixed drink by a woman produces a corresponding blood alcohol rate of 0.03 grams percent, while metabolism dissipates blood alcohol at 0.015 grams percent per hour. Based on Greene's blood alcohol level of 0.18 around 10:00 p.m., Dr. Burton concluded she probably consumed six or more drinks, rather than the four or five she admitted to. And assuming Greene's last drink was consumed at 6:30 p.m., Dr. Burton calculated her blood alcohol between 8:00 and 8:30 p.m. was as high as 0.20 grams percent. Final absorption occurs an hour after the last drink is consumed, and in Greene's case that would put her peak blood alcohol level as high as 0.21 grams percent at 7:30 p.m.

The scientific reliability and objectivity of testing for blood alcohol concentration have been recognized by the General Assembly and by the courts.[6] The salient circumstance in this case is the forensic analysis of a substantially contemporaneous blood sample, placing Greene's blood alcohol level at 0.18 grams percent. This is direct proof that her motor skills should have been degraded. In our view, that fact distinguishes this case from precedents where circumstantial evidence of subsequent intoxication was insufficient to rebut direct and uncontradicted evidence that a person was not noticeably intoxicated when last served alcohol.[7] Based on this reliable and

---

[6] *Lattarulo v. State*, 261 Ga. 124, 126 (3) (401 SE2d 516) (1991); *Johnson v. State*, 231 Ga. App. 215, 216 (498 SE2d 778) (1998).

[7] *Birnbrey &c.*, supra, 244 Ga. App. at 729 (1) (where expert could only assume driver had a blood alcohol level of 0.10 grams percent 3.75 hours after last being served, his opinion that such driver would have shown manifestations could not overcome direct testimony that driver appeared and acted normal at the time he was last served or furnished alcohol); *McElroy*, supra, 210 Ga. App. at 201-202 (deputy's testimony that, four hours after driver left party, he was observed in convenience store parking lot extremely intoxicated did not contradict direct testimony that driver was not noticeably intoxicated when last furnished alcohol).

objective scientific fact, Dr. Burton's affidavit authorizes the favorable inference that at 6:30 p.m., when Greene was last served alcohol, her blood alcohol level was at least 0.15 grams percent and possibly as high as 0.18 grams percent.[8] According to Dr. Burton, at such a level of intoxication, "there are a number of manifestations of intoxication [that] vary with the person's history of drinking." Such manifestations are more conspicuous to those not similarly intoxicated. "Courts and juries are not bound to believe testimony as to facts incredible, impossible, or inherently improbable. Great physical laws of the universe are witnesses in each case, which cannot be impeached by man, even though speaking under the sanction of an oath."[9]

Here, all of Northside's employees testified that a 25-year-old female dancer, who had no extensive history of drinking alcoholic beverages, did not manifest any signs of noticeable intoxication despite having consumed enough cocktails to result in a blood alcohol level twice the lawful limit for safe drivers.[10] In our judgment, a jury could find this testimony inherently improbable when juxtaposed with the objective and reliable scientific evidence, which is the strongest circumstantial evidence that the nature of the case will admit. The trial court erred in granting summary judgment against plaintiff's claim against Northside under the Dram Shop Act, OCGA § 51-1-40 (b).

3. Club rules required dancers who appeared noticeably intoxicated to surrender their keys and take a cab home.[11] Plaintiff claimed that Northside assumed a duty of care by this policy, making out a claim under common law general negligence principles. We disagree.

Under the controlling precedent of the whole court decision in *Kappa Sigma Intl. Fraternity v. Tootle*,[12] OCGA § 51-1-40 (b) affords plaintiff her exclusive remedy against Northside for damages arising from Greene's driving while intoxicated. Consequently, the trial court correctly granted summary judgment to Northside on any arguable claim based on common law general negligence principles.

*Judgment affirmed in part and reversed in part. Johnson, P. J., and Eldridge, J., concur. Andrews, P. J., disqualified.*

---

[8] See *Cheevers v. Clark*, 214 Ga. App. 866, 868 (2) (449 SE2d 528) (1994). Indeed, expert testimony about the metabolic rate for alcohol dissipation is not necessary in order to support the inference that a blood alcohol level an hour before testing was higher than that registered by the subsequent test. Id.

[9] *Patton v. State*, 117 Ga. 230, hn. 5 (43 SE 533) (1903).

[10] In both civil and criminal proceedings, OCGA § 40-6-392 (b) (3) authorizes the inference that a person was under the influence of alcohol to the extent it was less safe for him to drive, if there was at the time an alcohol concentration of 0.08 grams or more.

[11] Claims against the driver and the owner of the vehicle were dismissed with prejudice.

[12] 221 Ga. App. 890, 893 (2) (473 SE2d 213) (1996) (whole court).

DECIDED APRIL 19, 2001 —
RECONSIDERATION DENIED MAY 4, 2001

*Browning & Tanksley, Charles B. Tanksley*, for appellant.
*Savage, Turner, Pinson & Karsman, Brent J. Savage, C. Dorian Britt, H. Lehman Franklin, Jr.*, for appellee.