A96A0229. KAPPA SIGMA INTERNATIONAL FRATERNITY et al.
v. TOOTLE et al.
(473 SE2d 213)

RUFFIN, Judge.

Sonya Tootle sued the Kappa Sigma International Fraternity and its local chapter (collectively "the Fraternity") for the alleged wrongful death of Ernest Tootle, who was killed in an automobile accident with Clinton Fair. Fair was intoxicated at the time of the accident, and Tootle alleged that under OCGA § 51-1-40 (b) the Fraternity proximately caused the accident because it furnished Fair with alcoholic beverages. The Fraternity appeals from the trial court's denial of its motion for summary judgment. We reverse.

"[A]t summary judgment a party who will not bear the burden of proof at trial need not conclusively prove the opposite of each element of the non-moving party's case. Rather, that party must demonstrate by reference to evidence in the record that there is an absence of evidence to support at least one essential element of the non-moving party's case. In other words, summary judgment is appropriate when the court, viewing all the facts and reasonable inferences from those facts in a light most favorable to the non-moving party, concludes that the evidence does not create a triable issue as to each essential element of the case." *Lau's Corp. v. Haskins*, 261 Ga. 491, 495 (4) (405 SE2d 474) (1991).

1. The Fraternity asserts the trial court erred in denying its motion for summary judgment on Tootle's claim under OCGA § 51-1-40 because the undisputed evidence shows that it did not knowingly sell, furnish, or serve alcoholic beverages to Fair.

OCGA § 51-1-40 (b) provides that a person "who knowingly sells, furnishes, or serves alcoholic beverages to a person who is in a state of noticeable intoxication, knowing that such person will soon be driving a motor vehicle, may become liable for injury or damage caused by or resulting from the intoxication of such . . . person when the sale, furnishing, or serving is the proximate cause of such injury or damage."

In this case, the Fraternity presented undisputed evidence showing it did not sell, furnish, or serve alcohol to Fair. The evidence showed that on the day of the accident, Fair, who was 21 years old and not a Fraternity member, attended a party sponsored by the Fraternity. Before the party, Fair and two friends went to a store where they purchased a cooler and three twelve-packs of beer. After purchasing the beer, they went to an apartment and met with several other people who were attending the party. Fair drank two or three of the beers while at the apartment and took the remaining beers with him to the party.

Approximately 150 to 200 people attended the party which was held at a farm. The Fraternity hired a band and served hamburgers and hot dogs to members and guests in attendance. There were several coolers containing beer and other alcohol "just sitting [sic] around on the sand" and a keg on the back of a truck. However, Fair testified in his deposition that he only drank beer from his cooler and did not drink any other alcohol. Similarly, Fair stated in an affidavit that the Fraternity did not sell, serve, or furnish him with any alcoholic beverages at the party. The Fraternity president and several of its members stated in affidavits that the Fraternity "did not sell, furnish or serve any alcoholic beverages at the luau party" and that "[a]ll the alcohol present at the party was brought by the individual members or guests who wanted to consume alcohol." In addition,

other individuals who attended the party with Fair stated that they saw him drinking only the beer he purchased earlier that day. Fair's girl friend drove him home from the party, and the fatal accident occurred later that day while Fair was driving around town looking for friends.

In response to this evidence, Tootle points to what she contends is circumstantial evidence that Fair consumed alcohol provided by the Fraternity. This evidence showed that one Fraternity member brought a cooler of alcoholic punch to the party and that at least one non-member drank some of the punch. Tootle also points to evidence showing that a Fraternity member was operating the beer keg and that anybody could get beer from the keg. Tootle argues that a jury could reasonably infer from this evidence that the Fraternity served alcohol to Fair. We disagree.

"Where direct and positive testimony is presented on an issue, the opposing party must show some other fact which contradicts the testimony. If this other fact is direct evidence, that is sufficient to allow the case to go to the jury; if the other fact is circumstantial evidence, it must be inconsistent with the defendant's evidence, or if consistent, it must demand a finding of fact on the issue in favor of the plaintiff." (Citations and punctuation omitted.) *McElroy v. Cody*, 210 Ga. App. 201, 202 (435 SE2d 618) (1993).

In this case, the only evidence Tootle relies on is circumstantial evidence that is consistent with the Fraternity's direct evidence that it did not provide Fair with any alcoholic beverages. The evidence that some Fraternity members had alcoholic beverages at the party and served them to non-members is not inconsistent with the evidence that the Fraternity organization did not provide any alcohol to Fair and that Fair did not consume any alcohol provided by the Fraternity. Furthermore, Tootle's circumstantial evidence does not demand a finding of fact in her favor. Even if Fair did consume alcohol other than the beer he brought to the party, the evidence shows that it could have been provided by any number of guests who brought their own alcohol to the party. There is simply no evidence disputing Fair's own testimony that he did not consume any alcohol provided by the Fraternity.

We also disagree with the dissent's view that the Fraternity can be held liable simply because Fair became intoxicated while attending a Kappa Sigma party. If the General Assembly intended to impose liability under such circumstances, it could have simply stated so. See OCGA § 1-3-1 (a). Rather, what is at issue here is whether the Fraternity knowingly *sold, furnished, or served* alcoholic beverages to Fair. The undisputed evidence showed that it did not.

Although it is undisputed that the Fraternity sponsored the party at which Fair consumed alcohol, that is insufficient to impose

liability upon the Fraternity. "OCGA § 51-1-40 (b) does not impose liability upon one who merely furnishes the premises upon which alcohol is consumed. It imposes liability *only upon one who furnishes the alcohol itself.* Furnish is to provide for use; to supply. A furnisher is one who furnishes or provides supplies of any kind. A furnisher is one who supplies or fits out. To furnish or supply necessarily carries with it the idea of ownership, property in, or dominion over the thing furnished by the one who furnishes. The *uncontroverted* evidence of record demonstrates that [the Fraternity] did not furnish any alcohol to [Fair]." (Citations and punctuation omitted; emphasis supplied.) *Viau v. Fred Dean, Inc.*, 203 Ga. App. 801, 802 (1) (418 SE2d 604) (1992).

Accordingly, because the Fraternity demonstrated that it did not sell, furnish, or serve any alcohol to Fair, and Tootle has not pointed to any evidence disputing this essential fact, no triable issue exists as to whether the Fraternity is liable to Tootle under OCGA § 51-1-40 (b). See id.; *Lau's Corp.*, supra. It is therefore unnecessary to determine whether the Fraternity knew Fair was intoxicated or that he would be driving, and the trial court erred in denying the Fraternity's motion for summary judgment on this claim. See *Viau*, supra; *McElroy*, supra.

2. The Fraternity asserts that the trial court erred in denying its motion for summary judgment on Tootle's claims based on general negligence principles because under the facts presented OCGA § 51-1-40 (b) is her exclusive remedy. We agree.

OCGA § 51-1-40 (a) provides that "[t]he General Assembly finds and declares that the consumption of alcoholic beverages, rather than the sale or furnishing or serving of such beverages, *is the proximate cause of any injury*, including death and property damage, inflicted by an intoxicated person upon himself or upon another person, *except as otherwise provided in subsection (b)* of this Code section." (Emphasis supplied.)

In this case, to the extent that Tootle's complaint states claims for the Fraternity's general negligence, such claims are based on the Fraternity allegedly providing alcohol to Fair or allowing Fair to drive under the influence of alcohol. Thus, such claims are governed by OCGA § 51-1-40 (b). Tootle's contentions that these claims are supported by a non-statutory duty on the part of the Fraternity to operate the party in a non-negligent manner are without merit. A provider of alcoholic beverages is insulated from liability to third parties except as provided in subsection (b). See *Riley v. H & H Operations*, 263 Ga. 652 (1) (436 SE2d 659) (1993). Accordingly, the trial court erred in denying the Fraternity's motion for summary judgment on Tootle's general negligence claims.

*Judgment reversed. Beasley, C. J., Birdsong, P. J., Pope, P. J.,*

*Andrews, Blackburn and Smith, JJ., concur. McMurray, P. J., dissents. Johnson, J., disqualified.*

MCMURRAY, Presiding Judge, dissenting.

I, respectfully, dissent as I cannot go along with the majority's holding, which allows a social host such as Kappa Sigma to dodge liability under Georgia's Dram Shop Act by simply calling upon its members and guests to provide "beer [and] liquor" at a party the fraternity planned, organized and sanctioned. It is my view, that Ernest Edwin Tootle's death at the hands of a college student who became intoxicated at a Kappa Sigma party is all that is necessary to subject the fraternity to host-liability under the Dram Shop Act. I, therefore, do not believe the controlling issue in the case sub judice is whether the fraternity provided alcohol to Fair (as the circumstances reveal that the fraternity did via the efforts of its individual members). I believe the issues we must resolve are whether the fraternity knew or should have known that Clinton Earl Fair was in a state of noticeable intoxication before leaving the luau party and, if so, whether the fraternity knew or should have foreseen that Fair would soon be driving. OCGA § 51-1-40 (b); *Riley v. H & H Operations*, 263 Ga. 652, 654 (2) (436 SE2d 659). And to this end, I have examined the evidentiary record and find proof which supports the trial court's determination that genuine issues of material fact remain as to Kappa Sigma's liability under Georgia's Dram Shop Act.

1. *Is Kappa Sigma a provider of alcohol as contemplated by the Dram Shop Act?* I believe so, in view of the principle that all legitimate inferences must be drawn in favor of the party resisting a motion for summary judgment. See *Anderson v. Redwal Music Co.*, 122 Ga. App. 247, 249 (176 SE2d 645).

Kappa Sigma operates a chapter at Georgia Southern University ("the university" or "Georgia Southern") and is regulated by the university's division of student affairs. Four days before the party in question, Kappa Sigma's social chairman filed an appeal with the university's division of student services so that the fraternity could deviate from the university's Code of Student Conduct and serve alcohol at its upcoming luau party. Kappa Sigma declared in its appeal that there is no reason for deviating from the university's guidelines for using alcohol; that "Beer [and] Liquor" will be present at the party and that the party's alcohol supply will be furnished on a "B.Y.O.B." basis. The fraternity also promised to provide security at the party, to enforce a system for controlling underage drinking and to provide "sober drivers" for party patrons who become too intoxicated to drive. These assurances, as well as other promises relating to safety measures at the party, induced Georgia Southern to approve Kappa Sigma's appeal. The resulting party, however, did not

measure up to the university's expectations.[1]

According to Ricky Darrell Lovett, a security guard at the Kappa Sigma party, the event was conducted at a remote farm and the party grounds comprised several acres, a small lake or pond, a bandstand, a water slide, a waterfall, a "man-made beach" and two large parking areas. Lovett testified that the party started late in the morning, ended late in the afternoon and was attended primarily by young college students. Lovett explained that the fraternity supplied party patrons with disposable cups for the consumption of alcohol; that coolers of beer were randomly scattered over the party grounds and that he noticed Kappa Sigma fraternity members making trips to their cars during festivities, apparently to re-stock the party's alcohol supply. Lovett also affirmed that, by the end of the party, "a majority of the people at this party were [noticeably] intoxicated."[2] Lovett explained, however, that neither he nor any other security officers monitored "who was leaving as far as the level of sobriety [because] that's not our duty, to see who is driving what."

The depositions of other party attendees reveal that considerable quantities of beer and liquor were openly available at the party and that any party patron who desired to consume alcohol could do so, including persons who were legally too young to drink alcohol. There

---

[1] Dr. James Darby Orr, Jr., Associate Dean of Students and Greek advisor at Georgia Southern University, testified in his deposition that Georgia Southern expects all social fraternities to abide by creeds which reflect high moral standards and honorable social goals. Dr. Orr extended the following explanation: "The word social fraternity is misunderstood in many ways. Historically, the word social means in and of society, not party. Basically, a social fraternity is a fraternity which, hopefully helps the man or woman, and the word fraternity is a generic term used for both fraternities and sororities, become an active, productive member of society, and to that end, they do a lot of things that, hopefully, give them that ability. . . . First of all, obviously, one of the aims, and historically it has been an aim, is that, in effect, it provides a kind of family away from family while the student is at college. They have as their objectives the desire and the program, hopefully, to help their members achieve well academically. Traditionally, Greeks are above the academic average of non-Greeks. Secondly, they foster brotherhood or sisterhood, as the case may be, to help provide this family atmosphere and help one another learn. Thirdly, they all have a set of standards that they will enforce on their members, and if you wish to be a member of that group, you have to meet that set of standards. Fifthly, they all have as part of their creed the requirement that you learn how and participate in community service, which all of our Greeks do [at Georgia Southern University]. Learning to give to society and to be a productive member of society is part of this. The sixth thing that all of them attempt to do is to instill in their members leadership ability, their ability to work with other people closely for common objectives."

[2] Lovett explained this conclusion during the following examination: "[PLAINTIFF'S ATTORNEY:] And what do you mean by that, observable [intoxication]? You could tell they were intoxicated? [LOVETT:] Oh, yeah, you can tell when — you can tell the difference between normal, rational behavior and getting out and jumping, because when these kids party, they party. I mean, they have a good time, and they're jumping all over the place and jumping on each other, and you can tell when the line has crossed and everybody is just having a good time. It's just one of those natural things. Q. And would you say a majority of the people that attended this party had crossed that line? A. Yes, I would."

is also testimony indicating that at least one Kappa Sigma member distributed alcohol at the party from a large keg of beer; that coolers of liquor-laden punch were openly available to any person who wished to drink; that Clinton Earl Fair (along with others) left his cooler of beer unattended at the party; that such coolers were a primary source of the party's alcohol supply and that Clinton Earl Fair left his cooler behind when he left at about 4:30 in the afternoon.[3]

In light of the above circumstances, I think it is absurd to say (as a matter of law) that Kappa Sigma was not a provider of alcohol as contemplated by Georgia's Dram Shop Act. Indeed, it can be easily inferred from the above circumstances that the beer Clinton Earl Fair brought to Kappa Sigma's party was merely his admission pass or ticket, so to speak, to the festivities. Notwithstanding, the simple truth is that Clinton Earl Fair drank excessive amounts of alcohol at Kappa Sigma's party, Kappa Sigma planned to have alcohol at its party and Kappa Sigma members and guests supplied alcohol, as planned, on a "B.Y.O.B." basis. To me, these circumstances are sufficient to subject Kappa Sigma to scrutiny under Georgia's Dram Shop Act. To say otherwise, in my opinion, is nothing more than "a wink and a nod" method of diluting the effect and reach of the Dram Shop Act.

2. *The controlling issues.* I believe the controlling issues in the case sub judice are whether Kappa Sigma knew or should have known that Clinton Earl Fair was in a state of noticeable intoxication and, if so, whether the fraternity knew or should have foreseen that Fair would soon be driving. OCGA § 51-1-40 (b). See *Riley v. H & H Operations*, 263 Ga. 652, 654 (2), 655, supra. To this extent, Kappa Sigma cites undisputed proof that Fair was a passenger in his girl friend's Jeep when he left the party and argues that this fact alone precludes the possibility that any "reasonable jury could conclude that Kappa Sigma knew or should have known that Clinton Earl Fair would soon be driving. . . ." This argument is without merit.

In *Riley v. H & H Operations*, 263 Ga. 652, supra, the Supreme Court disapproved the trial court's interpretation "that to be held liable under the [Dram Shop] Act, the provider of alcohol must have *actual* knowledge that the buyer is a minor who will be driving soon." (Emphasis in original.) Id. at 654 (2). The Supreme Court then adopted a "reasonable care" test in construing the operative statutory language — "knowing that such person will soon be driving . . ." — and thus focused on issues relating to foreseeability rather than duty, as I suggested in my dissent in *Manuel v. Koonce*, 206 Ga. App.

---

[3] I think it important to clarify that Clinton Earl Fair was not just a 21-year-old man who wandered in on Kappa Sigma's luau party. He was an invited guest and, at the time, a scholarship athlete at Georgia Southern University.

582, 589 (2), 590 (425 SE2d 921). See *Riley v. H & H Operations*, 263 Ga. 652, 654 (2), 655, supra. The Supreme Court then presented the following rule for measuring liability under Georgia's Dram Shop Act: "If one in the exercise of reasonable care should have known that the recipient of the alcohol was a minor [or (as can be reasonably inferred) in a state of noticeable intoxication] and would be driving soon, he or she will be deemed to have knowledge of that fact." Id. at 654 (2), 655.

In the case sub judice, there is no question that ample proof exists regarding the fact that Clinton Earl Fair was in a state of noticeable intoxication when he left Kappa Sigma's luau party. The only question, then, is whether any Kappa Sigma member or agent should have foreseen that Fair would soon be driving. To this extent, I observe evidence indicating that the Kappa Sigma member who invited Fair to the party knew that Fair had driven his girl friend's Jeep to the remote party grounds and that he had done so after consuming alcohol. I also observe evidence indicating that Fair announced his departure from the party at 4:30 in the afternoon, in the presence of several Kappa Sigma fraternity members; that no Kappa Sigma fraternity member or security guard inquired as to Fair's means of transportation home and that no Kappa Sigma fraternity member or guard asked Fair about his state of intoxication or his ability to drive. I believe these circumstances, along with the fact that the party was at a remote location and the fact that the Kappa Sigma member who invited Fair to the party knew that Fair's truck was parked at the location where he and Fair had assembled with others on the morning before the party, raise genuine issues of material fact as to whether Kappa Sigma should have foreseen or even cared to determine whether Fair would soon be driving after leaving the luau party. I, therefore, do not think the trial court erred in denying Kappa Sigma's motion for summary judgment.

DECIDED JUNE 27, 1996 —

*Bovis, Kyle & Burch, Steven J. Kyle, John H. Peavy, Jr.*, for appellants.

*Brown & Livingston, Charles H. Brown, Becky D. Livingston, Barrow, Sims, Morrow & Lee, A. Mark Lee*, for appellees.