## A06A1149. BECKS v. PIERCE.
(638 SE2d 390)

MIKELL, Judge.

On April 13, 2002, after consuming alcohol at Jay's Place Sports Bar and Lounge (the "Bar"), Jeffery Fleming fell asleep while driving, and his vehicle crossed the median and struck an oncoming vehicle in which Mary Pierce was a passenger. Pierce brought an action against Gerald Becks d/b/a the Bar, alleging that the Bar was liable to her for injuries and damages caused by or resulting from Fleming's intoxication under the Dram Shop Act (the "Act").[1] Becks filed a motion for summary judgment, which the trial court denied. The trial court issued a certificate of immediate review, and we granted Becks's application for interlocutory appeal.

"When reviewing the grant or denial of a motion for summary judgment, this Court conducts a de novo review of the law and the evidence, construing that evidence and all reasonable inferences and conclusions therefrom in the light most favorable to the nonmovant."[2] Additionally,

> a party who will not bear the burden of proof at trial need not conclusively prove the opposite of each element of the non-moving party's case. Rather, that party must demonstrate by reference to evidence in the record that there is an absence of evidence to support at least one essential element of the non-moving party's case.[3]

Because we conclude that there is an absence of evidence to satisfy the statutory requirement that the appellant knew that Fleming was soon to drive, we reverse the trial court's denial of Becks's motion for summary judgment.

The record in this case shows that Fleming arrived at the Bar between 9:30 and 10:30 p.m. on April 12, 2002, where he met his friends George Blunt and Devon Hood. Fleming deposed that he was at the Bar for approximately five to five-and-a-half hours and that during that time, he consumed two or three glasses of vodka with

---

[1] OCGA § 51-1-40.

[2] (Footnote omitted.) *Hulsey v. Northside Equities*, 249 Ga. App. 474, 475 (1) (548 SE2d 41) (2001), aff'd, *Northside Equities v. Hulsey*, 275 Ga. 364 (567 SE2d 4) (2002).

[3] (Citation omitted.) *Kappa Sigma Intl. Fraternity v. Tootle*, 221 Ga. App. 890, 891 (473 SE2d 213) (1996).

cranberry juice and two cups of beer. Fleming stated that he left the Bar at approximately 3:30 a.m., walking past the security guard and two police officers. He also recalled that he did not consume any alcohol during the hour before he left the Bar because he started to feel like he had drunk too much. Fleming could not recall if his keys were in his hand when he exited the Bar and did not know if he showed obvious signs of intoxication at that time but deposed that he was a "little buzzed." Nonetheless, he did not think that he was having any trouble walking when he left the Bar. He admitted, however, that he was under the influence of alcohol at the scene of the collision, having a blood alcohol concentration of 0.109.

Fleming testified that he had visited the Bar three or four times before the accident occurred; that most of its patrons arrived by car; that he had never seen a cab waiting for customers at the Bar, and no one offered him a cab that evening; that no one at the Bar commented on his level of intoxication or refused him a drink; and that no one from the Bar asked him if he would be driving that evening.

Blunt, Fleming's friend, deposed that while shooting pool with Fleming until 11:00 or 12:00 p.m., he saw Fleming consume two or three drinks, but he did not see Fleming again that evening. Blunt also deposed that when they parted company, Fleming's appearance was normal in that his speech was not slurred and he was not sweating profusely. Blunt admitted, however, that because of his own intoxication, he was not really paying attention to Fleming. Blunt's recollection was consistent with Fleming's that most of the Bar's customers arrived by car and that cabs were not typically waiting outside. Blunt stated that he had been patronizing the bar for five to six years and that even when he was obviously intoxicated, he had never been refused a drink, nor had he ever seen the Bar turn away any other customer who was noticeably intoxicated.

Hood deposed that he arrived at the Bar between 9:30 and 10:30 p.m.; that Fleming and Blunt were already there when he arrived; that Fleming drank one or two cups of beer and two mixed drinks; that he did not remember when he last saw Fleming but does recall that Fleming did not appear to be intoxicated then; that when he left the Bar, he was very intoxicated and did not see Fleming's car; and that he drove past the accident scene but did not know that Fleming was involved. Hood further deposed that most customers arrived by car; that it was his experience that customers were not refused drinks even if they exhibited obvious signs of intoxication; that a security guard was posted on the outside of the entrance to the Bar and because of the design of the parking lot, customers could be seen entering their cars from the entrance; and that the security guards often watched intoxicated persons drive away after they were escorted from the Bar because of their conduct.

Officer M. C. Questelles, who investigated the accident, averred that he arrived at the scene of the accident at 3:55 a.m.; that Fleming was noticeably under the influence of alcohol and exhibited several signs consistent therewith; that he cited Fleming with driving under the influence, to which he pled guilty; and that Fleming's intoxication contributed to the collision.

In opposition to Becks's motion for summary judgment, plaintiff introduced the affidavit of John Holbrook, a professor in pharmacology and toxicology. Holbrook's opinions were based upon various facts in the record, including but not limited to, Fleming's weight, the amount of alcohol that he consumed and the time that he was last served, the one marijuana joint he smoked for five to seven minutes between 6:30 and 7:30 p.m. earlier on the evening in question,[4] the police officer's testimony regarding Fleming's visible signs of intoxication, and Fleming's blood alcohol level after the accident. Holbrook opined that Fleming was in a noticeable state of intoxication that should have been obvious to the Bar's employees when he was last served an alcoholic beverage between 2:00 and 2:30 a.m.; that at the time Fleming was last served, his blood alcohol level would have been approximately 0.15 grams or higher; that the Bar's employees stationed at the door should have observed Fleming's symptoms of central nervous system depression caused by a combination of the consumption of alcohol, use of marijuana, and Fleming's lack of sleep; that when the accident occurred, Fleming's blood alcohol level would have been approximately 0.127 grams since it was 0.109 grams when taken at 5:30 a.m. after the accident; and that Fleming's loss of consciousness, rather than the act of falling asleep, caused the accident.

Holbrook deposed that a standard mixed drink would produce in Fleming a blood alcohol level of 0.03 grams percent. Additionally, his calculations of Fleming's blood alcohol content were based on the average rate of dissipation of the alcohol from the time that Fleming said he had his last drink. He further deposed that Fleming, an infrequent alcohol user, would have been showing symptoms of intoxication at the Bar, including an altered gait, hyperverbalization, bloodshot eyes, and slurred speech with a blood alcohol level of 0.09 grams or greater. Holbrook also suggested that the testimony of Blunt and Hood be discounted because they were both intoxicated, making them less likely to notice Fleming's signs of intoxication.

Becks, the owner of the Bar, deposed that the Bar employs security guards, bartenders, servers, and police officers; that if any employee determined that a patron had consumed too much alcohol,

---

[4] Fleming admitted this fact in his amended responses to plaintiff's first interrogatories.

it was that person's responsibility to prevent that individual from leaving the Bar by driving; and that his general manager, Derek Poteat, trained the employees on signs of intoxication. Poteat deposed that the area in which the Bar was located was commercial and residential; that the Bar posted the names and numbers of three local cab companies for customers and for its staff; that it was the Bar's policy that employees escorting someone out or stationed at the door had a duty to stop a noticeably intoxicated person from getting in and driving a car and to ask how that person was getting home; that the policy was to call a cab and take the customer's keys or alert the police if the customer refused to tender his keys; that he did not know Fleming; and that if a customer left the bar alone, it was more than likely that he was driving.

In its order denying Becks's motion for summary judgment, the trial court concluded that jury issues remained as to whether Fleming was noticeably intoxicated when he was served his last drink; whether based on the training given to the Bar's employees, Becks should have known that Fleming would soon be driving; and whether Fleming's lack of sleep, as opposed to his intoxication, caused the accident. The trial court also ruled that punitive damages, not to exceed $250,000, could be sought against the defendant. On appeal, Becks argues that the trial court erred by ruling that: (1) the existence of a policy to ask noticeably intoxicated persons how they were getting home created a question of fact as to whether the server knew the person was driving; and (2) punitive damages are recoverable in a Dram Shop Act action.

1. In pertinent part, OCGA § 51-1-40 (b) provides that

[a] person who . . . knowingly sells, furnishes, or serves alcoholic beverages to a person who is in a state of noticeable intoxication, knowing that such person will soon be driving a motor vehicle, may become liable for injury or damage caused by or resulting from the intoxication of such . . . person when the sale, furnishing, or serving is the proximate cause of such injury or damage.

On appeal, Becks does not dispute the trial court's conclusions that genuine issues of fact remained as to whether Fleming was noticeably intoxicated and that his intoxication caused the incident.[5] Instead,

---

[5] We presume that the appellant did not enumerate as error the trial court's finding that the expert's affidavit created a question of fact as to whether Fleming was noticeably intoxicated when he was last served alcohol because of our Supreme Court's majority opinion in *Northside Equities*, supra. Therein, the Court held that a question of fact was created, on the key issue of noticeable intoxication at the moment the last drink was served, by an expert's affidavit based on circumstantial evidence, despite unimpeached direct testimony that the

Becks argues that there was no evidence that the Bar knew that Fleming would soon be driving.

It is a long-standing rule that the Act does not require that the person selling, furnishing, or serving alcohol have actual knowledge that the patron was soon to drive.[6] "Rather, if a provider in the exercise of reasonable care should have known *both* that the recipient of the alcohol was noticeably intoxicated *and* that the recipient would be driving soon, the provider will be deemed to have knowledge of that fact."[7] In *Sugarloaf Café v. Willbanks*,[8] our Supreme Court addressed the evidence required to show that the server of alcohol knew that the person served would soon be driving. In that case, the person causing the accident did not drive to or from the café but was taken to her car by one of her co-workers, all of whom accompanied her to the café and were intoxicated when they departed.[9] The trial court granted summary judgment to the café.[10] This court reversed,[11] finding that a genuine issue of fact remained as to whether the bartender knew or should have known an intoxicated patron would soon be driving based on the reasonable inference that one of the intoxicated group of patrons would be driving since they were in a remote location.[12] The dissent points out that the majority's finding that the café was in a remote location was based upon an expert affidavit.[13] The dissent found the majority's reasoning flawed because there was direct evidence in the record that contradicted the expert's conclusion that the club was located in a remote area.[14] The Supreme Court agreed,

---

bar's patron was not visibly intoxicated at the crucial moment. Id. at 365. *Northside Equities* seems to have promulgated a special evidentiary rule for dram shop cases which varies from the long established Georgia principle that inferences drawn from circumstantial evidence are unavailing to contradict unimpeached direct evidence, provided that the inference is not "demanded" by the circumstantial evidence, i.e., when the circumstantial evidence could support inferences in either direction. E.g., *McElroy v. Cody*, 210 Ga. App. 201, 202 (435 SE2d 618) (1993) citing *Withrow Timber Co. v. Blackburn*, 244 Ga. 549, 553 (261 SE2d 361) (1979). Accord *Myers v. Phillips*, 197 Ga. 536, 542 (29 SE2d 700) (1944); *Taggart v. Savannah Gas Co.*, 179 Ga. 181 (175 SE 491) (1934); *Frazier v. Ga. R. & Banking Co.*, 108 Ga. 807 (33 SE 996) (1899). See also *Sugarloaf Café v. Willbanks*, 279 Ga. 255, 256 (612 SE2d 279) (2005); *Birnbrey &c. v. Yirga*, 244 Ga. App. 726, 729 (1) (535 SE2d 792) (2000).

[6] See *Riley v. H & H Operations*, 263 Ga. 652, 654-655 (2) (436 SE2d 659) (1993).

[7] (Footnote omitted; emphasis in original.) *Baxley v. Hakiel Indus.*, 280 Ga. App. 94, 95 (2) (633 SE2d 360) (2006). But see *Delta Airlines v. Townsend*, 279 Ga. 511, 515 (614 SE2d 745) (2005) (no liability against airlines, which would have no way of knowing that passengers would be driving soon).

[8] Supra.

[9] Id. at 255-256.

[10] Id. at 256.

[11] *Willbanks v. Sugarloaf Café*, 266 Ga. App. 426, 427 (597 SE2d 410) (2004).

[12] Id. at 428-429.

[13] Id. at 431.

[14] Id. at 430-431.

concluding that expert opinion evidence could not be used "to contradict the direct evidence showing that [the customer] did not drive to or from [the club] because it [was] based only on inferences and [did] not establish the conclusion that [the club] knew [the customer] would be driving soon after she left."[15] Quoting the dissent, the Court stated that the "majority opinion [below] place[d] an affirmative duty on providers of alcohol to determine the method by which a patron plans to depart the business establishment, *and* how that patron plans eventually to get home. That affirmative duty exceeds the duty established by the legislature."[16]

Appellee maintains that based on the Bar's policy, it could have and should have determined that Fleming was soon to drive. However, in light of *Sugarloaf Café v. Willbanks*,[17] the Bar's policy cannot supplant the statutory requirement that the defendant have knowledge that the person will soon be driving when served his last drink. Appellee makes much of the fact that there was no evidence in the record from the Bar employee who actually served Fleming's last drink. But no such evidence is required.[18] Instead, the record shows that there was no evidence that Fleming displayed his keys at any time or otherwise did anything to indicate that he might be driving. Furthermore, Fleming was not a regular customer of the Bar such that the employees would know that he would be driving.[19] When asked at the motion hearing to explain the evidence that gave the Bar knowledge of Fleming's intent to drive, plaintiff offered no additional evidence but discussed at length the fact that Fleming walked by three Bar employees when he exited the building. Fleming's intention at that time, however, is not the relevant inquiry under the statute. Rather, the statute requires that the person serving the last drink know that the patron is soon to drive. In support of her argument, appellee also points to the evidence that most customers drove to the Bar to support the inference that the Bar should have known that Fleming was soon to drive despite evidence that the Bar was in a commercial and residential area. However, this argument also lacks merit. In *Sugarloaf Café v. Willbanks*,[20] the Court concluded that circumstantial evidence that an alcoholic beverage server

---

[15] (Citations omitted.) *Sugarloaf Café v. Willbanks*, supra at 256.

[16] (Punctuation omitted; emphasis in original.) Id. at 256-257.

[17] Supra.

[18] In *Willbanks v. Sugarloaf Café*, supra at 427, the bartender did not remember serving the defendant.

[19] Compare *Griffin Motel Co. v. Strickland*, 223 Ga. App. 812, 815 (2) (479 SE2d 401) (1996) (summary judgment appropriately denied where the hotel knew that an intoxicated person would soon be driving).

[20] Supra.

does business in a "remote" location and that most customers drive to the server's place of business is insufficient to show that the server knew a customer would soon be driving.[21] Accordingly, we find that the trial court committed reversible error when it concluded that a genuine issue of fact remained on the issue of whether the Bar knew that Fleming was soon to drive.

2. Because we have concluded that Becks's motion for summary judgment should have been granted, we need not discuss the trial court's ruling on punitive damages.

*Judgment reversed. Blackburn, P. J., and Adams, J., concur.*

DECIDED NOVEMBER 2, 2006 — 

*Fields, Howell, Athans & McLaughlin, Gregory L. Mast, Paul L. Fields, Jr.*, for appellant.

*Peter A. Law, James E. Lee II, Ernest M. Moran*, for appellee.

*Butler, Wooten & Fryhofer, James E. Butler, Jr.*, amicus curiae.