**FIRST DIVISION**
**BROWN, C. J.,**
**BARNES, P. J., and WATKINS, J.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 31, 2025**

# In the Court of Appeals of Georgia

A25A0771. KENDRICK v. FISH TALE RESTAURANTS, LLC.
A25A0772. KENDRICK v. RJM TRADING, INC.

WATKINS, Judge.

Following a fatal single-vehicle collision, Appellant Andria Kendrick, the surviving spouse of K. Chad Kendrick ("Kendrick"), filed a wrongful death action against Kathleen Arnsdorff, who was driving a passenger truck in which Kendrick was riding. Appellant also sued the owner of the vehicle, as well as two bars that had served alcoholic beverages to the Arnsdorff. In Case No. A25A0771, Appellant seeks review of the grant of summary judgment in favor of Fish Tale Restaurants, LLC, doing business as Fish Tales. Case No. A25A0772 is her appeal from the grant of summary judgment in favor of RJM Trading Inc., doing business as Game Time Sports Bar. Because the trial court did not err in finding that Arnsdorff was not

"noticeably intoxicated" when Fish Tales served her and because there is no evidence that Game Time knew or should have known that she would soon be driving,[1] we affirm.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.[2]

*Fish Tales*

Viewed in the light most favorable to Appellant, the record shows that on the evening of Saturday, December 7, 2019, Arnsdorff spent roughly five hours at Fish Tales. Although December 7 was a busy "event night" for Fish Tales due to a boat parade and fireworks, Fish Tales does not dispute that it served Arnsdorff multiple alcoholic drinks while she was there.

---

[1] See OCGA § 51-1-40 (b).

[2] (Citation and punctuation omitted.) *Sepid, LLC v. Dock*, 374 Ga. App. 825 (913 SE2d 86) (2025).

2

The evidence from motion-activated surveillance video footage, deposition testimony, and bar receipts shows that three different bartenders served Arnsdorff the following drinks: a shot of Jameson at an outdoor tiki bar at around 7:05 p.m.; a single Moscow Mule at approximately 7:13 p.m. at the tiki bar; a double Moscow Mule at the indoor bar around 8:04 p.m., and then two single Moscow Mules from the tiki bar, one around 8:55 p.m. and the other around 9:57 p.m. By the time Arnsdorrf ordered a final Moscow Mule at approximately 10:39 p.m., Fish Tales had run out of ginger beer, one of the ingredients for the drink. Fish Tales does not dispute that it provided Arnsdorff with straight vodka (sans mixer) or that, viewed in the light most favorable to Appellant, Arnsdorff consumed at least some of it.

*Game Time*

Arnsdorff left Fish Tales at around 11:40 p.m. and arrived at Game Time when the bartender was doing the last call shortly before the midnight closing time. As she walked in, Arndorff briefly encountered Kendrick and Jason Padgett, the only two customers still in the bar. Arnsdorff grabbed Padgett's arm and yelled at him and Kendrick to "Get the F out." Arnsdorff ordered a margarita before heading to the

restroom. There is no surveillance video from Game Time,[3] but the record shows that the bartender served Arnsdorff the margarita at approximately 11:55 p.m. Neither Padgett nor the bartender saw whether Arnsdorff consumed the margarita.

Meanwhile, Padgett and Kendrick were looking for their friend and driver, Andrew Dufresne, and trying to reach him by phone. Padgett and Kendrick had ridden with Dufresne to Game Time a few hours earlier, and had expected him to drive them home.

Padgett testified that Arnsdorff came outside and apologized for yelling at them when she arrived. Arnsdorff explained that she had been in the food service business and had wanted to help the bartender clear people out. Padgett recalled that Arnsdorff may have helped them look for Dufresne; at some point, Kendrick and Padgett gave up looking. Kendrick had the keys to Dufresne's pickup truck, and Arnsdorff offered to drive the two men in the truck to Kendrick's house, which was approximately two miles away. Padgett sat in the front passenger seat while Arnsdorff drove. Kendrick, sitting in the backseat, continued trying to reach Dufresne by phone.

---

[3] See Division 3 (b), infra (discussing Appellant's spoliation argument).

According to phone records, Kendrick connected with Dufresne at 12:43 and 12:48 a.m. Dufresne informed Kendrick that he was still at Game Time, so Kendrick instructed Arnsdorff to head back. After turning around, Arnsdorff began driving recklessly; Padgett heard Kendrick remark from the backseat that she had hit 100 miles per hour. Padgett told Arnsdorff to slow down, but she either ignored him or told him that she knew what she was doing.

At approximately 12:53 a.m., the truck "fishtailed," went off the road, and struck a utility pole and a tree. Live power lines were down, and the truck became engulfed in flames. Emergency vehicles arrived within minutes. Arnsdorff was treated at the scene before being transported by ambulance to a hospital, arriving there around 1:50 a.m. Padgett suffered serious injuries, but survived the crash. Tragically, Kendrick was pronounced dead at the scene.

It is unclear at what time Arnsdorff's blood was drawn to measure the level of alcohol because hospital records list the time as 1:02 a.m. on December 8, which was prior to her arrival at the hospital. The test results showed an ethanol level of 204 mg/dl, which Appellant's expert testified is the equivalent of a whole blood alcohol concentration ("BAC") of 0.173.

Appellant filed the instant suit, alleging that Fish Tales and Game Time were liable under Georgia's Dram Shop Act, OCGA § 51-1-40, and seeking damages for wrongful death and loss of consortium, as well as attorney fees and punitive damages. Following a hearing, the trial court entered separate, detailed orders granting both establishments' motions for summary judgment. These appeals followed.

The Dram Shop Act provides in relevant[4] part:

> A person who sells, furnishes, or serves alcoholic beverages to a person of lawful drinking age shall not thereby become liable for injury, death, or damage caused by or resulting from the intoxication of such person, including injury or death to other persons; provided, however, a person . . . who [1] knowingly sells, furnishes, or serves alcoholic beverages to a person who is in a state of noticeable intoxication, [2] knowing that such person will soon be driving a motor vehicle, may become liable for injury or damage caused by or resulting from the intoxication of such . . . person when the sale, furnishing, or serving is the [3] proximate cause of such injury or damage.[5]

---

[4] The "state of noticeable intoxication" element does not apply when the recipient of the alcoholic beverages is under 21. See OCGA § 51-1-40 (b), (c). There is no dispute that Arnsdorff was 29 years old and thus of lawful drinking age in December 2019.

[5] OCGA § 51-1-40 (b). See *Birnbrey v. Yirga*, 244 Ga. App. 726, 728 (1) (535 SE2d 792) (2000) (delineating the three elements).

"[A] party who will not bear the burden of proof at trial need not conclusively prove the opposite of each element of the non-moving party's case. Rather, that party must demonstrate by reference to evidence in the record that there is an absence of evidence to support at least one essential element of the non-moving party's case."[6] With this framework in mind, we now turn to the issues presented in these appeals.

*Case No. A25A0771*

1. In granting summary judgment in favor of Fish Tales, the trial court held, inter alia, that: (1) there was no evidence that Arnsdorff was noticeably intoxicated when she was served at Fish Tales; (2) Fish Tales had no reason to expect that she would soon be driving a motor vehicle; and (3) Appellant failed to establish that the service of alcoholic beverages at Fish Tales was the proximate cause of Kendrick's death. Appellant challenges each of these findings, arguing that there were genuine disputes of material fact as to each element of the Dram Shop Act. We disagree.

---

[6] (Citation and punctuation omitted.) *Shin v. Estate v. Camacho*, 302 Ga. App. 243 (690 SE2d 444) (2010).

(a) In related claims of error, Appellant argues that summary judgment was improper because there was evidence that Fish Tales knowingly served Arnsdorff alcoholic beverages[7] when she was in a state of noticeable intoxication.

On this point, the direct evidence in the record is uncontradicted. Fish Tales presented testimony of employees who were familiar with Arnsdorff's general personality and had interacted with her that night. Arnsdorff had recently worked at Fish Tales, and her former coworkers described her as normally "very talkative" and outgoing, openly affectionate, "high-strung," "wide open all the time," opinionated, headstrong, argumentative, and sometimes obnoxious — behaviors that can also be associated with intoxication.

According to the bartender who served Arnsdorff the double Moscow Mule around 8 p.m. and then saw her again toward the end of the night, she "seemed fine"

---

[7] As an initial matter, there is no dispute that Fish Tales knowingly served alcoholic beverages to Arnsdorff. Fish Tales does contend that Arnsdorff did not actually consume the 10:39 drink (the straight vodka for which Arnsdorff never got a mixer) and instead "absent-mindedly *started* to take a sip a few times, but . . . *immediately stopped upon tasting the straight vodka*." Thus, construed in the light most favorable to Appellant, Arnsdorff did consume this drink. And, any dispute as to how much she consumed is relevant to the third element (proximate cause), not the first element (whether Fish Tales sold, furnished, or served the beverage). See OCGA § 51-1-40 (b).

and "seemed like Kat." The bartender who served Arnsdorff the last two drinks (at 9:57 p.m. and 10:39 p.m.) testified that she was not noticeably intoxicated; more specifically, he recalled that she was not slurring her words and did not have glassy eyes. He further said that Arnsdorff's behavior in going into the employee-only Beer Room and attempting to help clean up trash at the end of the night did not seem like odd behavior for Arnsdorff. Similarly, the third bartender who served Arnsdorff at Fish Tales testified that Arnsdorff was not noticeably intoxicated during their brief conversation just after 10:30 p.m.

In rebuttal, Appellant presented only circumstantial evidence to suggest that Arnsdorff may have been noticeably intoxicated by the time she was last served at Fish Tales (10:39 p.m.). Specifically, Dr. Eagerton, Appellant's expert in pharmacology and toxicology, opined that, while being served at Fish Tales, Arnsdorff's BAC would likely have been below 0.08 around 9 p.m. and then "probably" over 0.10 by 10:30 p.m.[8] Eagerton testified that he was not personally familiar with Arnsdorff's general

---

[8] Although Appellant seems to suggest that an off-duty employee and fellow patron "served" Arnsdorff a final beverage at 11:09 p.m., Appellant does not provide a supporting record cite. See generally Court of Appeals Rule 25 (d) (1) (i) ("Each enumerated error shall be supported in the brief by specific reference to the record or transcript. In the absence of a specific reference, the Court will not search for and may not consider that enumeration."). To the extent that Appellant does contend that

9

personality and behaviors, and he made a number of assumptions in extrapolating backwards from the BAC measured after the crash.

Dr. Eagerton viewed two files from the time-stamped video footage: a 10-15 minute clip from the Beer Room (after Arnsdorff was last served) and a longer clip that did not provide as close-up of a view of her. Eagerton noted certain behaviors in the footage that he believed were consistent with intoxication, but his testimony was equivocal at best. For example, he testified that at some time "later on" than 10:19, Arnsdorff and the off-duty employee "seemed to be flirting," which "can be consistent with alcohol intoxication." On the other hand, he noted, "she may be a normally flirty person[,]" and "standing next to [the off-duty employee], she looks fine compared to him because he . . . looked really intoxicated" to Eagerton.

Dr. Eagerton testified that Arnsdorff "appeared to be a little bit wobbly at times and not as surefooted as what [Eagerton thought] a normal, unimpaired person would be[,]" but she was "clearly not falling down drunk or anything like that." Later he testified that her balance generally "seemed to be okay[ ]" and that "[t]here was

such conduct by the off-duty employee created liability on the part of Fish Tales, "the trial court never ruled on this claim, leaving nothing for this Court to review." *Leavy v. Cornelius*, ___ Ga. App. ___ (920 SE2d 172, 2025 Ga. App. LEXIS 350 at *8 (2), 2025 WL 2450682) (Aug. 26, 2025).

nothing that was apparent on that video to suggest that her balance was abnormal." Eagerton did not pay attention to possible other causes of Arnsdorff being "wobbly," such as what type of shoes Arnsdorff was wearing, but he agreed that footwear "[a]bsolutely" could have an impact on a person's steadiness.[9] Eagerton further testified that he could not tell from the video footage whether Arnsdorff was exhibiting other signs, such as slurring her words or whether her eyes were red or glassy.

Dr. Eagerton thus primarily relied on his calculations which he made by extrapolating backwards from the BAC of 0.173 in Arnsdorff's hospital records. In doing so, he made a number of assumptions, including the time the blood sample was drawn,[10] Arnsdorff's weight, a consistent rate of consumption of the drinks throughout the night, that she finished every drink that she was served at Fish Tales,

---

[9] Appellant focuses on video footage from 10:50 p.m. that, according to Appellant, shows Arnsdorff "nearly fall to the floor while leaving a barstool." Appellant has not pointed to any evidence actually interpreting this footage as a sign of intoxication. The unrebutted testimony is that she appeared to have caught the heel of her boot on the footrest but managed to right herself without falling.

[10] As noted above, it is unlikely that the time noted in the hospital records (1:02 a.m.) is accurate. However, Dr. Eagerton testified that, even if the time were off by an hour or two, it would not make much difference.

that the only other alcoholic beverage she had was the midnight margarita at Game Time, and an average elimination rate.

Using these assumptions, Dr. Eagerton estimated that Arnsdorff's BAC around 9 p.m. would have been below 0.08 and that around 10:30 (when Fish Tales last served her), it was "probably" over 0.10. Dr. Eagerton acknowledged it was "very possible" that at this amount over 0.10 there would still not be noticeable signs of intoxication from an experienced drinker and that such a drinker could compensate and mask some of the effects (such as unsteadiness and slurred speech) and not appear drunk.

According to Eagerton, at a BAC of 0.12, Arnsdroff "would certainly have been exhibiting signs of intoxication, but how apparent that would have been, could be somewhat debatable." Eagerton added, "to answer [the] question [at 0.12,] was she exhibiting symptoms; she could have been. She certainly was under the influence. And if somebody would have engaged and looked closer, you would have been able to determine the impairment."

Eagerton further qualified his opinion, stating that individualized factors such as physiological makeup, metabolism rate, and previous experience with alcohol make

a difference, such that "it's difficult to say or pretty much impossible to say that at this level,[11] this person is going to be exhibiting these systems." But at some level, "usually around [0].15," Dr. Eagerton opined that "the ability of the majority of people to mask those effects of alcohol degrades significantly. Most people are visibly and appreciably intoxicated at those levels and above." However, Eagerton did not opine that Arnsdorff was at such a level of intoxication when Fish Tales served her an alcoholic beverage.

In arguing that the trial court erred in granting summary judgment on this element, Appellant primarily relies on *Northside Equities v. Hulsey*,[12] which emphasized the summary judgment standard, carefully scrutinizing the movant's evidence while "treating with indulgence" the evidence of the nonmovant.[13] In *Hulsey*, an expert opined (based on the driver's BAC of somewhere between .18 and .21 at the time of the crash) that "a woman with [the driver's] blood alcohol level

---

[11] Viewed in context, "this level" appears to refer to any specific level below 0.15.

[12] 275 Ga. 364 (567 SE2d 4) (2002).

[13] See id. at 365.

would have exhibited manifestations of intoxication."[14] Our Supreme Court held there:

> The evidence that [the driver] was not noticeably intoxicated was not uncontradicted because the expert testimony was that a woman with [the driver's] blood alcohol level would have exhibited manifestations of intoxication. Since the direct evidence was not uncontradicted, the inference to be drawn from the circumstantial evidence had probative value and, coupled with the conclusive presumption in OCGA § 40-6-391 (a) (5) that a person with a blood alcohol level less than half of [the driver's blood alcohol level] is impaired,[15] was sufficient to create a question of fact whether [the driver] was noticeably intoxicated when she was served alcohol at work.[16]

*Hulsey* is distinguishable because here, the circumstantial evidence provided by Dr. Eagerton did *not* contradict the direct evidence that Arnsdorff was *not* noticeably intoxicated when Fish Tales served her alcoholic beverages.[17] "In passing upon a

---

[14] Id. at 364-365.

[15] See OCGA §§ 40-6-391 (a) (5); 40-6-392 (c) (1).

[16] 275 Ga. at 364-365. But see id. at 366 (Fletcher, C. J., dissenting) ("The majority has changed the statutory duty from observing a person's appearance to determining a person's actual blood alcohol level.").

[17] Cf. *Hulsey v. Northside Equities*, 249 Ga. App. 474, 477-478 (2) (548 SE2d 41) (2001) (adding further context for *Hulsey*: an expert had opined that the driver's BAC

14

motion for summary judgment, a finding of fact which may be inferred but is not demanded by circumstantial evidence has no probative value against positive and uncontradicted evidence that no such fact exists."[18] In the absence of evidence that Arnsdorff appeared noticeably intoxicated, Appellant's claim against Fish Tales lacks a required element.[19] The trial court, therefore, did not err in granting summary judgment on this ground.

2. In light of our holding in Division 1 (b), we need not reach Appellant's remaining claims of error. Accordingly, we affirm summary judgment in favor of Fish Tales in Case No. A25A0771.

---

was at least 0.15 and possibly as high as 0.18 when she was last served alcohol and that at such a level of intoxication, there were a number of manifestations of intoxication that varied with the person's history of drinking; additionally, there was direct testimony that the 25-year-old driver had no extensive history of drinking alcoholic beverages), affirmed by 275 Ga. 364.

[18] (Citation and punctuation omitted.) *Birnbrey*, 244 Ga. App. at 728 (1); accord *McElroy v. Cody*, 210 Ga. App. 201, 202 (435 SE2d 618) (1993). See also *Becks v. Pierce*, 282 Ga. App. 229, 232 n. 5 (1) (638 SE2d 390) (2006) (noting in dicta that *Hulsey* "seems to have promulgated a special evidentiary rule for dram shop cases which varies from the long established Georgia principle that inferences drawn from circumstantial evidence are unavailing to contradict unimpeached direct evidence, provided that the inference is not 'demanded' by the circumstantial evidence, i.e., when the circumstantial evidence could support inferences in either direction[ ]").

[19] See *Birnbrey*, 244 Ga. App. at 730 (1).

3. In granting summary judgment in favor of Game Time, the trial court held that there was no evidence that Arnsdorff was noticeably intoxicated when she was served at Game Time and, alternatively, that Appellant's claim was barred by reason of the avoidance doctrine and contributory negligence on the part of Kendrick. Appellant argues that there were genuine disputes of material fact as to each element of dram shop liability and as to Game Time's affirmative defenses. We conclude that the trial court did not err in granting Game Time's motion for summary judgment.

(a) Appellant first argues that the record includes evidence that Arnsdorff was noticeably intoxicated when she was served just before midnight at Game Time.

In contrast to Fish Tales, there is much less direct evidence as to whether Arnsdorff was "noticeably intoxicated" when she arrived just before closing at Game Time. Very few people were still at the bar, and there is no video surveillance footage. Although the bartender testified that Arnsdorff seemed "fine" when she ordered a margarita right before closing time, the circumstantial evidence provided by Dr. Eagerton contradicted the direct evidence. Specifically, Eagerton testified that at 11:56 p.m., Arnsdorff's blood alcohol content was over 0.15. At this point, he testified, an

16

individual's ability to mask or compensate for some of the effects of alcohol "degrades significantly," such that an observer would have "no doubt" that the person was intoxicated. In light of this conflict, a genuine issue of fact remained as to whether Arnsdorff was noticeably intoxicated when she was served at Game Time.[20]

(b) Although the trial court did not reach the issue of whether Game Time knew Arnsdorff would be driving soon, "[a] grant of summary judgment must be affirmed if it is right for any reason, whether stated or unstated in the trial court's order, so long as the movant raised the issue in the trial court and the nonmovant had a fair opportunity to respond."[21]

> [T]o pursue a cause of action under the Dram Shop Act, [Appellant is] required to adduce evidence demonstrating that [Game Time] knew that [Arnsdorff] would *soon be driving a motor vehicle*. "Soon" means in the near future; shortly. The Act does not require that the person selling, furnishing, or serving alcohol have actual knowledge that the patron was soon to drive. Rather, if a provider in the exercise of reasonable care should have known both that the recipient of the alcohol was noticeably intoxicated and that the recipient would be driving soon, the provider will be deemed to have knowledge of that fact. And while

---

[20] See *Hulsey*, 275 Ga. at 364-365.

[21] *Georgia-Pacific, LLC v. Fields*, 293 Ga. 499, 504 (2) (748 SE2d 407) (2013) (citations, punctuation, and emphasis omitted).

constructive knowledge will suffice, providers of alcohol do not have an affirmative duty to determine the method by which a patron plans to depart the business establishment, and how that patron plans eventually to get home.[22]

In arguing that Game Time knew or should have known that Arnsdorff would be driving soon, Appellant relies on testimony from the bartender that most people arrive at Game Time by car.[23] Under Georgia law, however, such evidence alone does not support an inference that Game Time should have known that Arnsdorff was soon to drive.[24]

There was also no direct evidence that Arnsdorff "displayed [her] keys at any time" while at Game Time "or otherwise did anything to indicate that [s]he might be

---

[22] (Citations and punctuation omitted; emphasis supplied.) *Sepid, LLC*, 374 Ga. App. at 828-829 (1).

[23] The bartender added that sometimes customers who drove themselves to Game Time would leave their vehicles overnight and get a ride home from someone else or take a cab or Uber.

[24] See *Sugarloaf Café v. Willbanks*, 279 Ga. 255, 256-257 (612 SE2d 279) (2005) (rejecting argument that "circumstantial evidence that an alcoholic beverage server does business in a 'remote' location and that *most* customers drive to the server's place of business [is] sufficient to show that the server knew a customer would soon be driving[ ]") (emphasis in original).

driving."[25] Moreover, Arnsdroff was not a regular customer of Game Time "such that the bartender would know that [s]he would be driving."[26]

Appellant argues, however, that the trial court should have applied a spoliation presumption under OCGA § 24-14-22 based on Game Time's "failure to access and produce the security footage of the bar that night[,]" which may have shown, inter alia, whether Arnsdorff displayed her car keys when she was served there. Although Appellant raised spoliation below, the trial court did not rule on this claim. Appellant thus "cannot use the unresolved issue of spoliation to assert that genuine issues of material fact nonetheless exist."[27]

Even without a spoliation presumption, Appellant contends that a jury, "after observing Arnsdorff wearing the keys for five hours at Fish Tales, could reasonably assume that Arnsdorff continued to wear her keys and wallet on her wrist while at Game Time[.]" "Guesses or speculation which raise merely a conjecture or possibility

---

[25] *Becks v. Pierce*, 282 Ga. App. 229, 234 (1) (638 SE2d 390) (2006) (reversing denial of summary judgment because there was no evidence that a bar knew its patron would soon be driving).

[26] Id.

[27] *Dataforensics, LLC v. Boxer Property Management*, 361 Ga. App. 311, 318 (864 SE2d 140) (2021).

are not sufficient to create even an inference of fact for consideration on summary judgment."[28] However, assuming arguendo that Arnsdorff continued to carry or wear her wallet and keys as she had at Fish Tales, Appellant has failed to point to anywhere in the record[29] to support her statement that Arnsdorff's *car* key, as opposed to a house or other key, had been visible.[30] Because there was no evidence that Arnsdorff displayed a car key at any time or otherwise did anything to indicate that she might be

---

[28] (Citations and punctuation omitted.) *Taylor v. N.I.L., Inc.*, 221 Ga. App. 99, 100 (470 SE2d 491) (1996).

[29] See Court of Appeals Rule 25 (d) (1); see also *Hatchett Firm, P.C. v. Atlanta Life Fin. Group, Inc.*, 358 Ga. App. 607, 610-611 (856 SE2d 1) (2021) ("We remind counsel that it is not the job of the Court of Appeals to cull the record on behalf of a party, and that a lack of proper citations greatly hinders our consideration of the issues on appeal. Furthermore, the burden is on the party alleging error to show it affirmatively by the record. When the burden is not met, the judgment complained of is assumed to be correct and must be affirmed.") (citations and punctuation omitted).

[30] Cf. *Monterrey Mex, Inc. v. Collins*, 372 Ga. App. 70 (903 SE2d 759) (2024) (holding that there was a jury question as to whether a restaurant knew or should have known the recipient of alcohol would soon be driving where she attested that she was carrying her car key — with its visible Honda emblem — when she entered the restaurant, that her keys were in plain view at the table as she was served alcoholic beverages, and that, as she had done many times when she drove to the restaurant to eat and drink alcohol, she had parked her car where it was visible from inside the restaurant).

driving, the trial court did not err in granting summary judgment in favor of Game Time.

4. Based on our holding in Division 3 (b), we need not reach Appellant's remaining arguments. Accordingly, we affirm summary judgment in favor of Game Time in Case No. A25A0772.

*Judgments affirmed. Brown, C. J., and Barnes, P. J., concur.*